Alla **BOROVIKOVA**, Petitioner,

v.

**UNITED STATES DEPARTMENT OF JUSTICE**, Respondent.

Docket No. 02–4891.

United States Court of Appeals, Second Circuit.

Argued: May 20, 2005.

Decided: Jan. 18, 2006.

Bruno Joseph Bembi, Hempstead, NY, for Petitioner.

Dione M. Enea, Special Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Varuni Nelson and Steven Kim, Assistant United States Attorneys, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Respondent.

Before: OAKES and CABRANES, Circuit Judges, and GOLDBERG, Judge.*

---

* The Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

JOSÉ A. CABRANES, Circuit Judge.

Petitioner Alla Borovikova, a native of the former Union of Soviet Socialist Republics ("USSR" or "Soviet Union") and a citizen of Ukraine, petitions this Court for review of a November 21, 2002 order of the Board of Immigration Appeals ("BIA") affirming a decision of Immigration Judge Elizabeth A. Lamb ("the IJ") denying her application for asylum and withholding of removal. Case no. A 73 651 621 (February 8, 2000, New York). Petitioner entered the United States on or about February 17, 1995 and was admitted as a nonimmigrant visitor. After overstaying her visa, she applied for asylum largely on the basis of claims that she had been persecuted in Ukraine because she is a Jew. The IJ found petitioner's story not credible and denied her requests. Petitioner argues on appeal that the IJ lacked substantial evidence to support the adverse credibility determination and asks us to hold that any reasonable factfinder would be compelled to grant petitioner's applications for asylum and withholding of removal. *See* 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]"). She further argues that although she did not request relief under the United Nations Convention Against Torture ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, the IJ and BIA erred in not considering her qualification for such relief *sua sponte*. We disagree and, accordingly, the petition for review is denied.

## BACKGROUND

Borovikova was born January 12, 1941 in Russia. In her petition for asylum and withholding of removal, she alleges that she suffered anti-Semitic persecution in multiple countries from the time of her childhood until she fled to the United States in 1995. Among other things, she reported the following to the IJ:[1] that (1) as a child she was taunted by neighbors, classmates, and teachers because she was a Jew; (2) while in grade school, when she refused to join the "Komsomol,"[2]—a Communist youth organization—because its atheistic tenets violated her religion, she was taunted, assaulted, and beaten by classmates (including an incident in which a classmate threw a stone at her, giving her a "serious head wound") with no response from authorities; (3) when she applied to nursing school in 1958, she was refused admission because she was Jewish; (4) her family then moved to Kiev, Ukraine in hope of escaping persecution but she was again denied admission to nursing school in 1959, this time on the basis of "openly" announced anti-Semitic motives; (5) after finally being admitted to nursing school in 1960, she suffered additional harassment until her graduation in 1963, including having her arm broken by a student in retaliation for her refusal to join the Komsomol; (6) after a period of being denied nursing work, she married and found a nursing job at a hospital near her husband's military post in Taganrog, Russia but could not practice her religion openly because of its potentially negative impact on her husband's military career; (7) in 1972, petitioner's husband was transferred to East Germany, where she was subject to harassment, humiliation, and

---

1. These allegations appear in petitioner's "Additional Affidavit," dated May 22, 1998, which she filed in support of her application for asylum.

2. *See, e.g.,* Peter Kenez, *A History of the Soviet Union from the Beginning to the End* 53, 148 (1999) ("The youth organization, the Komsomol, was particularly important. It had twice as many members in the villages as the party and had a crucial role in agitating for government policies.").

government surveillance, and her husband suffered mistreatment and denial of promotion at work because of his wife's religion; (8) in January 1992 petitioner and her family moved to Kiev after her husband's discharge from the military; (9) in March 1992 she was attacked at a store, during which two men threw her physically from the premises and she broke her "foot in the shin"; (10) in January 1994 uniformed hooligans burst into petitioner's apartment, shouted anti-Semitic slogans, and poured scalding soup on her, after which medical authorities refused to treat her; (11) in September 1994, while petitioner was visiting her parents' graves, "a crowd of 7 or 8 people ... dressed in Rukh uniforms" [3] desecrated the cemetery, shouted anti-Semitic slogans at her, chased her, and beat her until she passed out, causing her to suffer a concussion and a fractured leg; (12) in November 1994, nationalists threw a smoke bomb into petitioner's apartment, set her front door on fire, and put a box of mercury under her front door, making petitioner and her daughter ill; and (13) she feared for her safety and decided to spend six months in the United States so that the "nationalists would forget about" her, but, after arriving in the United States in 1995, learned that conditions had worsened and that she "will be persecuted again" should she return to Ukraine. Petitioner now lives in Brooklyn, where she is a member of a Jewish community center and a synagogue.

## DISCUSSION

### I. Relevant Legal Standards

The standards for evaluating claims of asylum and requests of withholding of removal overlap considerably. Because the standard for a successful withholding of removal claim is higher than for an asylum claim—and because we find in this case that petitioner's asylum claim must be denied—we do not treat her withholding claim separately in detail. *Abankwah v. INS*, 185 F.3d 18, 22 (2d Cir.1999).[4]

The statute governing asylum claims—the Immigration and Nationality Act of 1952, as amended—gives the Executive discretion to grant asylum to an alien who "is a refugee within the meaning of" the statute. *See* 8 U.S.C. § 1158(b)(1)(A) ("Eligibility");[5] *id.* § 1101(a)(42) (defining "refugee").[6] An alien seeking asylum bears the burden of proving by a preponderance of the evidence that he is a "refugee" "with

---

**3.** The Rukh is a nationalist movement in Ukraine. *See Matter of OZ– & I–Z–*, 22 I. & N. Dec. 23, 24 (BIA 1998).

**4.** Petitioner did not raise her claims under the CAT before the IJ or the BIA. Because we hold that the IJ and BIA did not err in failing to consider *sua sponte* her eligibility for relief under the CAT, *see post*, we need not, and do not, consider the merits of petitioner's CAT claims.

**5.** 8 U.S.C. § 1158(b)(1)(A) provides that

[t]he Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General

under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of [8 U.S.C. § 1101(a)(42)(A)].

**6.** A "refugee" is defined, in relevant part, as

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42)(A).

a well-founded fear of persecution." *See id.* § 1158(b)(1)(B); *Matter of Acosta,* 19 I. & N. Dec. 211, 215 (BIA 1985); *see also Damko v. INS,* 430 F.3d 626, 632–34 (2d Cir.2005) (according deference to the BIA's statutory interpretation in *Matter of Acosta* as mandated by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

■ Because asylum determinations require intensive factual inquiries that appellate courts are ill-suited to conduct, our review of factual determinations by an IJ is tightly circumscribed.[7] *See* 8 U.S.C. § 1252(b)(4)(B) (stating that, on appeal, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"); *Zhou Yun Zhang v. INS,* 386 F.3d 66, 73 (2d Cir.2004) ("[W]e defer to the factual findings of the BIA and the IJ if they are supported by substantial evidence."). In cases like this one, in which the IJ bases her denial of asylum on a finding that a petitioner's application is not credible, our review is especially limited and "highly deferential." *Zhou Yi Ni v. DOJ,* 424 F.3d 172, 174 (2d Cir.2005); *Xu Duan Dong v. Ashcroft,* 406 F.3d 110, 111 (2d Cir.2005); *Jin Hui Gao v. United States Attorney Gen.,* 400 F.3d 963, 964 (2d Cir.2005); *see also Wu Biao Chen v. INS,* 344 F.3d 272, 275 (2d Cir.2003) (holding that we afford " 'particular deference to the credibility determinations of the IJ' ") (quoting *Montero v. INS,* 124 F.3d 381, 386 (2d Cir.1997)); *Zhou Yun Zhang,* 386 F.3d at 74 ("Where the IJ's adverse credibility finding is based on specific examples in the record of inconsistent statements by the asylum applicant about mat-

ters material to his claim of persecution, or on contradictory evidence or inherently improbable testimony regarding such matters, a reviewing court will generally not be able to conclude that a reasonable adjudicator was compelled to find otherwise.").

■ An adverse credibility finding, however, may not be upheld if based entirely upon "a misstatement of the facts" or "bald speculation or caprice." *Zhou Yun Zhang,* 386 F.3d at 74; *see also Secaida–Rosales v. INS,* 331 F.3d 297, 307 (2d Cir.2003) (indicating that IJ's reasons for an adverse credibility finding must be "specific" and "cogent" and must bear "legitimate nexus" to petitioner's claim of persecution). In evaluating a disputed adverse credibility finding, our role does not extend to "hypothesiz[ing] excuses" for the inconsistencies in an asylum applicant's testimony. *Zhou Yun Zhang,* 386 F.3d at 74; *see Jin Yu Lin v. DOJ,* 413 F.3d 188, 191 (2d Cir.2005).

## II. Petitioner's Asylum Claim

■ The facts stated by petitioner present a colorable asylum claim inasmuch as they allege a pattern of persecution on the basis of religion, which is a protected ground. *See* 8 U.S.C. § 1101(a)(42). The IJ denied petitioner's claim, however, upon finding that her story was not credible. Specifically, the IJ based her adverse credibility determination on three grounds: (1) that the birth certificate petitioner submitted was likely fraudulent; (2) that petitioner's original application for asylum and her supplemental affidavit presented contradictory stories, particularly regarding petitioner's experiences while living in East Germany; and (3) that petitioner gave inconsistent testimony at her hearing before

---

7. Where, as here, the BIA summarily affirms an IJ's opinion pursuant to the BIA's "streamlining regulations," *see* 8 C.F.R. § 1003.1(e), we review on appeal the decision of the IJ as

the final agency determination. *See, e.g., Yu Sheng Zhang v. DOJ,* 362 F.3d 155, 158–59 (2d Cir.2004).

the IJ concerning a document that purportedly supported her claim to have suffered a broken leg during an anti-Semitic attack. Upon a review of the record and the IJ's decision, we conclude that any of the three bases enumerated by the IJ, which we discuss in turn, could by itself have supported an adverse credibility finding. We therefore hold that the IJ's factual determination is "supported by substantial evidence" and decline to disturb the IJ's decision.

## A. The Birth Certificate

The first ground on which the IJ rested her adverse credibility determination was a finding that petitioner likely submitted a forged birth certificate. This finding is based primarily upon a report by an Immigration and Naturalization Service ("INS") [8] employee stationed at the United States Embassy in Moscow ("Embassy Report"). The Embassy Report described two "inconsistencies in [petitioner's] birth certificate leading [the INS employee] to believe that the submitted document is fraudulent." Specifically, the Embassy Report indicated that in 1960, when the document was purportedly issued in Kiev, Ukraine, Soviet documents produced outside of Russia "contained the language of the republic in the body of the document." Petitioner's document, however, contained the words "Birth Certificate" in Russian only, rather than in Russian and Ukrainian. Additionally, petitioner's birth certificate did not have "in the bottom left corner," as was standard in the USSR, "a

registration (or act) number along with the date of registration." For these reasons, the Embassy Report concluded, "It appears that the submitted document[ ] is a forgery."

The IJ considered the evidence submitted by petitioner to rebut the Embassy Report and found that "the rebuttal evidence [does not] overcome[ ] the embassy report," largely because the documents petitioner offered had not been authenticated pursuant to applicable regulations. *See* note 10, *post.* Petitioner objects to the IJ's finding, arguing that the IJ erroneously relied on *Matter of O–D–,* 21 I. & N. Dec. 1079 (BIA 1998), in concluding that because a government report cast doubt upon the legitimacy of petitioner's document, an "overall lack of credibility" is suggested. In an effort to distinguish this case from *Matter of O–D–,* petitioner notes the report here is of uncertain authority because the credentials and expertise of the INS employee who wrote the Embassy Report are unknown. In contrast, the report in *Matter of O–D–* came from the INS "Forensic Document Laboratory." *See id.* at 1079.[9] We disagree with petitioner's contention that the holding in *Matter of O–D–* depended on the particular credentials of the report's author. Although certain reports deserve greater deference than others, it was not error for the IJ to credit the sworn affidavit of an INS employee working at the United States Embassy in Moscow concerning the authenticity of Soviet documents. The IJ

8. The INS has since been replaced in 2003 as this country's immigration agency by the Immigration and Customs Enforcement division of the Department of Homeland Security. *See Karageorgious v. Ashcroft,* 374 F.3d 152, 154 n. 3 (2d Cir.2004).

9. Our dissenting colleague also criticizes the IJ's characterization of the Embassy Report as a "forensic report." *Dissent, post,* at 163.

We agree that the record does not illuminate whether the Embassy Report is truly the product of scientific analysis but believe that issue not to be of consequence inasmuch as the Embassy Report was surely worthy of the IJ's attention. *See Black's Law Dictionary* 676 (8th ed.2004) (defining "forensic" as "[u]sed in or suitable to courts of law or public debate").

therefore correctly concluded that, absent a satisfactory explanation or rebuttal by petitioner, the Embassy Report impeached her general credibility.

The rebuttal evidence proffered by petitioner was such that a reasonable IJ could arguably have accepted its validity and set aside the conclusion of the Embassy Report, but that evidence by no means was sufficiently persuasive to compel *any* reasonable IJ to reject the Embassy Report. *See* 8 U.S.C. § 1252(b)(4)(B) (requiring acceptance of IJ's factual findings on appeal "unless any reasonable adjudicator would be compelled to conclude to the contrary"). To support her argument that her birth certificate looked unusual, not because it was a forgery, but instead because it was reissued in 1960 after state authorities lost the original, petitioner presented: (1) an affidavit and accompanying documents from another woman who claimed that her own birth certificate (reissued in Ukraine in 1984) was printed in Russian only, rather than in both Russian and Ukranian; (2) a letter from a Ukranian official stating that a birth certificate in petitioner's maiden name was registered in a Kiev "civil registry book" on September 24, 1960 (the date on the certificate proffered by petitioner) and that it memorialized her birth on January 12, 1941 (petitioner's date of birth);[10] (3) speculation that some numbers on petitioner's birth certificate may constitute a registration number, contrary to the Embassy Report's finding that the document bore no registration number. Neither this evidence nor any other evidence or argument provided by petitioner[11] convinces us that the IJ's determination that the birth certificate was likely fraudulent was not "supported by substantial evidence." *Zhou Yun Zhang,* 386 F.3d at 73. The IJ therefore could have rested her adverse credibility determination on this finding alone.

## B. Petitioner's Experiences Prior to 1992

■ The second ground on which the IJ rested her adverse credibility finding was that petitioner's narrative of her life prior to 1992 in her initial asylum application differed considerably from the account she presented in her supplemental affidavit.[12] For instance, petitioner's original application described her time in East Germany as follows:

> In 1972 my husband was sent to serve in the Eastern Germany. I worked as a nurse in a military hospital. Our life was balanced, and during that time I didn't experience negative feelings of people towards me or any restrictions because of my nationality. Everything

**10.** Contrary to petitioner's contention that *this letter served to authenticate petitioner's* birth certificate, *see* Br. of Pet'r, at 28–29, such a letter does not satisfy the requirements for "Proof of official records" as set forth in 8 C.F.R. § 287.6(b). The regulation contemplates formal attestation by a foreign official who has seen the relevant document and subsequent certification by an American official, not merely a letter whose content accords with that of the disputed document. *See* 8 C.F.R. § 287.6(b) (requiring that "an official [foreign] record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an officer so authorized" and that

the "attested copy ... must be certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept").

**11.** Petitioner also offered a passport listing her ethnicity as "Jewish," a letter from Russian officials in her home town indicating that her birth certificate was not preserved, and evidence of her Jewish observance in the United States.

**12.** The initial application included a Form I–589 dated November 10, 1996 and an attached narrative statement. The supplemental affidavit is described *ante,* at note 1.

was O.K. in my relationships with colleagues and friends. However, some pressure was felt on the part of my husband's chiefs. They knew that his wife was a Jew, and Vitaliy was never promoted despit[e] many years of service. My husband's friends became high ranking officer[s.] However, I didn't know about that, and only his heart felt that pain.

Our family experienced the first blow in 1992, when Soviet troops started to leave Eastern Germany.

In contrast, petitioner's supplemental affidavit describes the years in East Germany as follows:

In 1972, my husband was transferred to serve in Eastern Germany. There, my family was being constantly watched by KGB agents. My husband and I never went anywhere, because we were afraid of insults and humiliations that I was being subjected to by the personnel, because I was Jewish. My husband was badly mistreated by his superiors, because I was Jewish. He was never promoted, but often degraded and humiliated because of that. Yet, I taught my daughter to be proud of being Jewish, and I brought her up in the Jewish rites and traditions. My husband supported me in my love for my religion.

Upon consideration of these two documents describing the same experiences, the IJ concluded that "the story changes totally." The IJ noted further allegations of persecution in petitioner's supplemental affidavit that had been omitted from the I-589 form.[13] Petitioner contends on appeal that her initial application omitted various instances of persecution because, as petitioner told the IJ at her hearing, she was instructed when filing the form to describe

only "the most serious incident." Petitioner characterizes the supplemental affidavit as adding detail to her prior account, not contradicting it or changing her story, much less changing it "totally." Our dissenting colleague describes the supplemental affidavit as "ascrib[ing] more urgency to the claimed discrimination against [petitioner's] husband" and containing "nothing inconsistent [with] her statement that she was not persecuted by her colleagues and friends at the time she worked in the military hospital." *Dissent, post,* at 164. We disagree and hold that there was substantial evidence to justify the IJ's finding that the documents contained material inconsistencies.

 Although petitioner's initial application mentioned her husband's problems at work in East Germany, it did not merely omit further details of persecution then suffered by petitioner's family. Instead, it specifically stated that petitioner "didn't experience negative feelings of people towards [herself] or any restrictions because of [her] nationality." In the supplemental affidavit, petitioner asserted that her "family was constantly being watched by KGB agents." She also stated that she and her husband "never went anywhere, because we were afraid of insults and humiliations that I was being subjected to by the personnel, because I was Jewish." Although one could imagine a benign explanation for these apparent inconsistencies, our role does not extend to "hypothesiz[ing] excuses" for the inconsistencies in an asylum applicant's testimony. *Zhou Yun Zhang,* 386 F.3d at 74; *see Jin Yu Lin,* 413 F.3d at 191 (2d Cir.2005). We reject petitioner's argument that no inconsistency exists between the statement that she "didn't

---

**13.** For example, the IJ noted that "[i]n the supplement, [petitioner] details many early problems both in grade school and farther on," in contrast to her original statement that her problems began in 1992.

experience negative feelings" or "any restrictions" on the basis of her "nationality" [14] and the report that KGB agents stalked her family, which feared traveling lest petitioner and her husband "be subjected" to "insults and humiliations." Whereas in the initial application all was well for petitioner in East Germany except for her husband's difficulties at work, in the supplemental affidavit, government agents and others placed petitioner's family in constant fear. Because such instances of persecution are directly related to petitioner's claimed eligibility for asylum—persecution on the basis of her religion—we hold that these inconsistent statements were material and therefore that the IJ did not err in basing her adverse credibility finding upon them. Indeed, the IJ's adverse credibility finding could have rested on these inconsistencies alone.

## C. The Medical Document

▉▉▉ The third ground on which the IJ based her adverse credibility finding concerned petitioner's testimony about the provenance of a document she presented to support her claim that her leg was broken by anti-Semitic attackers. Because the instance of persecution allegedly recorded in this document ranks among the most serious described in petitioner's supplemental application for asylum, questions about the legitimacy of the document bear a "legitimate nexus" to petitioner's claim. *See Secaida–Rosales*, 331 F.3d at 307. Our dissenting colleague argues that "even if we accept the IJ's characterization of this testimony as inconsistent, the testimony hardly goes to a matter material to Borovikova's claim." *Dissent, post,* at 167.

Since questions concerning the authenticity of documents may be vital to an IJ's decision whether an asylum applicant is recalling true events or struggling to parrot a script, the testimony at issue—concerning when petitioner received a medical document and how it reached the United States—is material to her claim.

The record includes multiple contradictory statements concerning this document. For example, the IJ asked petitioner if she ever saw the document while living in Ukraine, and she answered, "Yes." Later the IJ asked, "When did you get" the document? Petitioner answered, "When I filed for political asylum and I had to prove this fact and my daughter made an inquiry to the hospital . . . ." [15] Also, the IJ asked petitioner how the document arrived in the United States. Petitioner answered that she had obtained it on the date of her injury and left it with her daughter when she fled Ukraine, after which "acquaintances were going to the United States and my daughter passed a packet of documents with them in June 1996." When the IJ informed petitioner that the document was dated 1998, petitioner said, "I guess I received assistance and I didn't take the note, I forgot," but soon clarified, "I recall I didn't take the note then, they gave me first aid, but I didn't take a note, they gave me the x-ray film and that was it, yes." Petitioner explained further that her daughter subsequently obtained the document and mailed it to petitioner in the United States.

The excerpts of testimony quoted above clearly illustrate contradictions; at issue is

---

14. In the context of petitioner's claim, her "nationality" is the same as her religious identity. The disputed birth certificate, for example, describes each of petitioner's parents as "nationality—Jew."

15. Petitioner stated that the injury described in the medical document occurred in March 1992. Petitioner entered the United States in February 1995. The date on the document is 1998.

whether petitioner's contradictions exhibit a changing story or mere confusion. We hold that "substantial evidence" supports the IJ's finding even though a reasonable finder of fact could have reached the opposite conclusion. It is not enough that a reasonable person could—as our dissenting colleague does, see Dissent, post, at 167—believe that petitioner's testimony "hardly reflects obfuscation" and provides "no reason to reject" petitioner's argument that she was confused at first and then gave truthful answers about the document. Id. The question on appeal is not whether, upon an independent evaluation of the cold record, we would credit or discredit an applicant's testimony. Instead, precisely because we did not hear and see what the finder of fact did, we affirm the IJ's factual determinations because we cannot conclude that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Because the IJ's findings were not unreasonable, we hold that the IJ could have rested her adverse credibility determination on petitioner's conflicting testimony about the medical document alone.

### D. Petitioner's Overall Credibility

■ Each of the three asserted grounds discussed above, standing alone, would have been sufficient to support an adverse credibility determination. Nonetheless, even if no single ground had been persuasive enough on its own, the combination of them all surely was. When an IJ bases an adverse credibility finding on multiple grounds, we review the totality of the IJ's decision, instead of dissecting the IJ's opinion and reviewing each portion in isolation. Here, the IJ found that petitioner presented a false birth certificate, offered inconsistent written statements, and contradicted herself when testifying. These factors, in combination, convinced the IJ that petitioner was not "a credible

witness." While we can never be certain that the IJ correctly evaluated a petitioner's truthfulness, the statute that governs our review rests on the presumption that the IJ is in a better position than a reviewing tribunal to decide such questions. Because the IJ properly relied on "substantial evidence" in finding that petitioner lacked credibility, we accept her findings of fact.

### III. Petitioner's Withholding of Removal and CAT Claims

■ An applicant who, like petitioner, fails to establish her eligibility for asylum is necessarily unable to establish her eligibility for withholding of removal. See Abankwah v. INS, 185 F.3d 18, 22 (2d Cir.1999). Accordingly, petitioner's request for withholding of removal must be dismissed.

■ Finally, petitioner argues that although she did not seek relief under the CAT in her proceeding before the IJ, the IJ or BIA should have considered her eligibility for such relief sua sponte pursuant to 8 C.F.R. § 1208.13(c)(1). Because petitioner filed her asylum application on December 14, 1996, which is prior to the effective date of that regulatory provision, such sua sponte review was not required. See id. (describing procedures applicable to applications "filed on or after April 1, 1997"). Accordingly, the petition for review is denied insofar as it relates to petitioner's CAT claims.

### CONCLUSION

Upon our review of the record, we decline to set aside the IJ's adverse credibility finding and we find no fault with her application of the law. The IJ had the opportunity to question petitioner in person, to evaluate her demeanor, and to review all the documents in the record. Her

findings can be overruled "only if no reasonable fact-finder could have failed to find" the contrary result. *Jian Xing Huang*, 421 F.3d 125, 128 (2d Cir.2005) (internal quotation marks omitted). Because we conclude that that high standard has not been met, we cannot disturb the IJ's decision denying petitioner asylum and withholding of removal.

\* \* \* \* \* \*

We have considered all of petitioner's arguments and found each of them to be without merit. Accordingly, we DENY the petition for review, as well as petitioner's pending motion for stay of removal.

OAKES, Senior Circuit Judge, concurring in part and dissenting in part.

As to the majority's dismissal of Borovikova's CAT claims, I concur. However, as to the majority's holding regarding Borovikova's eligibility for asylum (and, in turn, its holding as to her eligibility for withholding of removal), I respectfully dissent. I believe the IJ's adverse credibility finding in this case is unsubstantiated. First, the IJ's finding that Borovikova's birth certificate was inauthentic goes against the weight of substantial evidence to the contrary, and it constitutes error. Borovikova introduced rebuttal evidence, uncontroverted by the INS, sufficient to establish that her birth certificate was authentic and that she is in fact a Ukrainian Jew. Second, neither of the two remaining grounds for the adverse credibility finding—a documentary inconsistency and a testimonial inconsistency—is sufficiently material to warrant denial of asylum.

In rejecting the authenticity of Borovikova's birth certificate, the IJ relied exclusively on a one-and-a-half-page affidavit by an INS assistant writing from the U.S. Embassy in Moscow, which stated that (1) Borovikova's certificate should have been issued in both the Ukrainian and Russian languages, not just in Russian, and (2) the certificate lacked a registration number. The affiant concluded that the document was a forgery. While the IJ characterized the affidavit as a "forensics" report, there is nothing in either the affidavit or the record indicating that the assistant had any forensic expertise regarding the authenticity of birth certificates re-issued in the Ukraine, nor does the cursory affidavit contain any objectively verifiable facts or criteria to substantiate the conclusion that the birth certificate was inauthentic. Furthermore, it is not clear whether the assistant had reviewed an actual copy of the birth certificate, or whether he merely reviewed a copy of its translation. The government's brief on appeal concedes that forensic analysis of the document was not possible because the original was unavailable. *See* Brief for Resp't at 39 n. 14.

In rebuttal to the INS affidavit, Borovikova's attorney submitted the following documents to substantiate her claim that she was in fact a Ukranian Jew and that her birth certificate was authentic: (1) A letter dated September 28, 1999, from the Ukranian Ministry of Justice, Department of Civil Registry, confirming that the January 12th, 1941, birth of Novatskaya Alla Nikolayevna (Ms. Borovikova's maiden name), was registered in the civil registry book for the city of Kiev on September 24, 1960. The re-issued Ukrainian birth certificate for Borovikova was issued on the same date, September 24, 1960.(2) A notice dated September 29, 1999, issued by the Archive of the Regional Department of Civil Registry Office from the city of Rostov–on–Don, Russia, confirming that the birth record for Novatskaya Alla Nikolayevna was not preserved in full. (3) A valid copy of Ms. Borovikova's Ukrainian passport identifying her ethnicity as "Jewish." (4) An affidavit and a copy of the birth certificate of another Ukrainian woman,

Rosita Khaymovich, whose birth certificate was reissued in 1984 in only the Russian language. It should be noted that, according to the translation of Borovikova's reissued birth certificate,[1] the certificate bears the number DEZ IBK No. 000904. Khaymovich's 1984 birth certificate also bears a similar number, DIZ I–JD No. 012715, that the translation identified as a registration number. The IJ did not address whether the INS assistant may have been mistaken in failing to notice that Borovikova's birth certificate bore such a registration number. The IJ stated that she considered the rebuttal evidence but concluded that she did "not find the rebuttal evidence overcomes the embassy report," because the rebuttal documents were not authenticated.

Although the IJ relied upon *Matter of O–D–*, 21 I. & N. Dec. 1079 (BIA 1998), 1998 WL 24904, in rejecting Borovikova's birth certificate as inauthentic, the facts in this case are distinguishable, and the IJ's reliance on *Matter of O–D–* is misplaced. In *Matter of O–D–*, the IJ's conclusion that the Mauritian petitioner in that case had submitted a fraudulent identity card rested on more substantial grounds, namely, a report by the Forensics Document Laboratory of the Immigration and Naturalization Service, and its finding was buttressed by the respondent's failure to refute or even address the conclusions of the forensic report. In Borovikova's case, the INS assistant's affidavit can hardly be characterized as a forensics report; it states no forensic basis for its opinion, and Borovikova has effectively responded and refuted it with far more convincing submissions. Furthermore, in the case of Borovikova, the INS has failed to respond, object, or otherwise challenge the authenticity of the re-

buttal documents, despite specific instructions to do so within 10 days of an October 19, 1999, hearing before the IJ. The IJ has offered no reason to question the authenticity of Borovikova's rebuttal documents, and therefore her conclusion that they fail to overcome the INS affidavit lacks any reasonable, substantial or probative support; in short, it is error. *See, e.g., Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 405 (2d Cir.2005) (finding IJ erred in rejecting petitioner's notarial birth certificate based on the petitioner's failure to authenticate it pursuant to "regulation").

Because the IJ's conclusion that Borovikova submitted a fraudulent birth certificate is not supported by substantial evidence, and there is substantial uncontroverted evidence sufficient to carry Borovikova's burden of proof that she is a Ukrainian Jew, I would accord no deference to the IJ's adverse credibility finding and conclude that Borovikova is in fact a Ukrainian Jew.

The remaining two grounds cited for the IJ's adverse credibility finding are immaterial, not based on substantial evidence, and therefore are insufficient to support the denial of asylum.

The first is a supposed documentary inconsistency between Borovikova's original 1996 written application and the subsequent 1998 supplementation by affidavit. According to the IJ, Borovikova's written account "changes totally" because the supplemental affidavit sets forth a more detailed account of the persecutions she suffered.

However, according to 8 C.F.R. § 1208.4(c) (2004), an asylum applicant may be granted the right to amend and supplement a prior written asylum applica-

---

1. The Joint Appendix contains only a translation of the birth certificate. Borovikova testified that she lost the original on the subway. It is not clear whether the government has or ever had its own copy of the original.

tion. Borovikova's amended statement clearly described all the incidents discussed in her in-court testimony, and the IJ does not cite any inconsistencies between her testimony and the amended application.

While the IJ concludes that Borovikova's story changed "totally," the IJ has not adequately identified an objectionable or material inconsistency. The only discussion of the inconsistency in the IJ's oral decision is as follows:

She said in that original statement attached to her application for political asylum that in 1972 she worked in a hospital and everything was okay. She says that she had no trouble with her colleagues or with other persons. She then goes on to supplement this I–589 and in the supplement the story changes totally. In the supplement, she details many early problems both in grade school and farther on. She says that her grades were changed, she was harassed and she does not paint the same picture that everything was okay, which I believe is a quote and she did not have problems until 1992. So, there is an internal inconsistency with her written application for political asylum.

Borovikova's original statement said the following regarding her time working as a nurse in a military hospital in East Germany, beginning in 1972:

Our life was balanced, and during that time I didn't experience negative feelings toward me or any restrictions because of my nationality. Everything was O.K. in my relationships with colleagues and friends. However, some pressure was felt on the part of my husband's chiefs. They knew that his wife was a Jew, and Vitaliy was never promoted despite many years of service.

Borovikova's supplemental written statement says the following about her time in East Germany:

In 1972, my husband was transferred to serve in Eastern Germany. There, my family was being constantly watched by KGB agents. My husband and I never went anywhere, because we were afraid of insults and humiliations that I was being subjected to by the personnel, because I was Jewish. My husband was being badly mistreated by his superiors, because I was Jewish. He was never promoted, but often degraded and humiliated because of that.

While the supplemental statement ascribes more urgency to the claimed discrimination against her husband, Borovikova's counsel correctly points out that there is nothing inconsistent about her statement that she was not persecuted by her colleagues and friends at the time she worked in the military hospital, and her amended application containing more detailed claims of persecution and discrimination directed at her husband at that time, particularly since her original application does mention that "some pressure was felt on the part of my husband," who was not promoted because "his wife was a Jew." It is not inconsistent to say that Borovikova's relationships with her colleagues and friends was "okay," but that her husband suffered discrimination at the hands of other individuals.

Notably, the IJ did not identify any testimony that was inconsistent with Borovikova's supplemented written application. Even where an applicant's testimony includes information omitted from a written application, "[a]n applicant's failure to list in his or her initial application facts that emerge later in testimony will not automatically provide a sufficient basis for an adverse credibility finding. 'Inconsistencies of less than substantial importance for

which a plausible explanation is offered cannot form the sole basis for an adverse credibility finding.'" *Secaida–Rosales v. INS,* 331 F.3d 297, 308 (2d Cir.2003) (quoting *Campos–Sanchez v. INS,* 164 F.3d 448, 450 (9th Cir.1999)).

Here, Borovikova was asked to explain why she did not detail all the specific events described in her amended submission in the initial application, and she offered a plausible explanation, testifying that when she filled out the initial application, she was instructed by the person assisting her and translating for her that she "should be brief" and only mention "the most serious incident."

As for the IJ's contention that Borovikova's statement that "everything was okay" in 1972 is inconsistent with supplemented information regarding earlier persecution in grade school and beyond, the IJ has hardly identified an inconsistency. There is nothing nefarious about the fact that Borovikova chose to include additional instances of persecution that occurred prior to 1972 in her supplemental written submission.

Other than to point to the textual inconsistency, the IJ does not call into question Borovikova's veracity or demeanor during her testimony. This Court has noted that even in the context of evaluating testimony, "credibility findings resting on analysis of testimony rather than on demeanor may deserve less than usual deference." *Secaida–Rosales,* 331 F.3d at 307 (quoting *Cordero–Trejo v. INS,* 40 F.3d 482, 487 (1st Cir.1994)). "Therefore, when a credibility determination analyzing testimony is based on flawed reasoning, it will not satisfy the substantial evidence standard." *Id.* Here, not only is the IJ's analysis of the written submissions flawed, but it seizes upon an inconsistency that, when viewed in light of the volumes of otherwise unchallenged testimony, is minor and immaterial to Borovikova's claim.

The second inconsistency on which the IJ based her adverse credibility finding involved a purported internal inconsistency in Borovikova's testimony regarding the means by which Borovikova received a hospital note from the Ukraine, which she submitted to corroborate her testimony that her leg had been broken in an attack motivated by ethnic hatred. According to the IJ:

[Borovikova] first said that she received this medical document on the same day that her leg was broken and during the testimony when the Assistant District Counsel asked her about the date that was on the document which was some time, some years afterwards, she then said, oh, I forgot and that is the explanation for the difference in her testimony about the document and from the date on the document itself.

Since the IJ's oral decision is not a model of clarity itself, it behooves us to review Borovikova's testimony to ascertain whether the IJ has correctly identified inconsistent testimony regarding a matter material to Borovikova's claim for asylum.

Upon being shown for identification the note from the hospital where she was x-rayed and treated for her broken leg, Borovikova, who testified through a Russian interpreter, was questioned about it first by her attorney, and then by the IJ:

Q. When you left Ukraine, who had this document?

A. Then all the documents remained with my daughter.

Q. Who sent it to you from Ukraine?

A. Some acquaintances were going to the United States and my daughter passed a packet of documents with them in June 1996.

JUDGE TO RESPONDENT

Q. Did you ever see this document when you lived in Ukraine?

A. Yes.

Q. When did you get it?

A. The documents when my leg was broken.

Q. What was that date?

A. I don't remember the date.

Q. What year was your leg broken?

A. March 10, 1992, maybe it's the same date that is on the note.

Q. Did you get the certificate the same date that your leg was broken?

A. Yes, perhaps.

Q. Well, the date on this certificate is 1998.

A. There was a note and I also made an inquiry to send the note, because my daughter was sending the documents, the note wasn't there.

Q. I don't know what you're talking about. I'm saying to you ma'am, there is a certificate that said your leg was broken and it was issued in 1998 and you're saying you had it in '92.

A. My leg was broken on March 10, 1992.

Q. That's not what I'm asking. You just told me that you got the certificate about your leg the same day your leg was broken yet the document that I have is dated 1998. That's not the day your leg was broken. Can you explain that?

A. I guess I received assistance and I didn't take the note, I forgot.

Q. Well, did you have, you told me you saw the document when you lived in Ukraine.

A. The document, the birth certificate, that's the document.

Q. I'm not talking about a birth certificate, I'm talking about the, ma'am,

I'm talking about the certificate from when you broke your leg.

*A. I recall I didn't take a note then, they gave me first aid, but I didn't take a note, they gave me the x-ray film and that was it, yes.*

*Q. So, when did you get the note about your leg?*

*A. When I filed for political asylum and I had to prove this fact and my daughter made an inquiry to the hospital and that's when she was given the note.*

*Q. How did it get to the United States?*

*A. She mailed it.*

*Q. Did you just tell me before friends brought it here?*

*A. Those were different documents, those were the ones that I had later.*

*Q. Ma'am, I'm talking about this note about your leg, you just told me before that your daughter sent it here with friends.*

*A. Those were different notes.*

*JUDGE TO MR. BHUSHAN*

*Q. Mr. Bhushan, continue.*

*A. Your honor, I do have the envelope where it was mailed in this document and it is dated August '98.*

*Q. Okay.*

Aug. 23, 1999, Hearing Tr. 41–44.

While the earlier part of the testimony demonstrates confusion on both the part of the IJ and Borovikova, it is indisputable that the latter portion of Borovikova's testimony—highlighted here for emphasis—clearly answered the question put to her by the IJ, and explained that the hospital note was produced in response to her inquiry while preparing her asylum application, and that it was sent to her by her daughter in August 1998. Borovikova's

attorney introduced the envelope corroborating this testimony.

Now, while the earlier part of this exchange left the IJ with the impression that Borovikova had testified inconsistently, it hardly reflects obfuscation, and the IJ has stated no reason to reject the only coherent part of Borovikova's testimony, the portion highlighted here, which (1) was clearly responsive to the judge's questioning, (2) cleared up the earlier confusion, and (3) was corroborated by the envelope introduced by Borovikova's attorney. Even if we were to accept the IJ's characterization of this testimony as inconsistent, the testimony hardly goes to a matter material to Borovikova's claim. "[I]nconsistencies that do not concern the basis for the claim of asylum or withholding, but rather matters collateral or ancillary to the claim," and "[m]inor discrepancies that do not 'involve the heart of the asylum claim,'" are not adequate bases for an adverse credibility finding. *Secaida–Rosales v. INS*, 331 F.3d 297, 308 (2d Cir. 2003) (quoting *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir.2002)).

Here, the IJ does not otherwise question the veracity of Borovikova's testimony that she suffered a broken leg when two men kicked her out of a store while using ethnic slurs, and that she was taken to the hospital and treated for the broken leg. The means by which the evidentiary corroboration of Borovikova's testimony reached the United States is hardly material to her claim. The alleged inconsistency on which the IJ seizes is clearly insufficient to support an adverse credibility finding.

In sum, I believe Borovikova has carried her burden and demonstrated eligibility for asylum as a Ukrainian Jew who has suffered past persecution and who harbors a reasonable fear of future persecution. I would grant the petition for review, and vacate and remand to the BIA for remand to the IJ for the grant of asylum.