RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BI QING ZHENG,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General,

Respondent.

No. 15-3758

On Petition for Review of an Order of the Board of Immigration Appeals.
No. A206 736 859.

Decided and Filed:  April 6, 2016

Before:  CLAY, GIBBONS, and STRANCH, Circuit Judges.

_____

**COUNSEL**

_____

**ON BRIEF:**  Chunyu Jean Wang, WANG LAW OFFICE, PLLC, Flushing, New York, for Petitioner.  Don G. Scroggin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

**OPINION**

_____

CLAY, Circuit Judge.  Petitioner Bi Qing Zheng filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  *See* 8 U.S.C. §§ 1158(a), 1231(b)(3)(A); 8 C.F.R. 208.16(c).  An immigration judge ("IJ") denied the application and ordered Zheng removed from the United States to China.  The Board of Immigration Appeals ("BIA") dismissed Zheng's appeal, and she subsequently filed this petition

1

seeking review of the BIA's order. For the reasons set forth below, we **DENY** the petition for review.

## BACKGROUND

Zheng, a native and citizen of the People's Republic of China, entered the United States without inspection by crossing the Mexican border on May 9, 2014. Zheng entered the United States with her twenty-two year old son, Yu Fan Chen. Following a credible fear interview, in which Zheng claimed that she was arrested by the police in China and threatened with harm unless she stopped practicing Christianity, the Department of Homeland Security ("DHS") initiated removal proceedings against Zheng by filing a Notice to Appear in immigration court. The notice charged that Zheng was subject to removal under 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled.

Zheng submitted a written pleading admitting the allegations in the Notice to Appear and conceding removability. On November 26, 2014, she filed an application for asylum, withholding of removal, and protection under the CAT, claiming that she had a well-founded fear of persecution on the basis of her religion. Zheng claimed that she feared returning to China because the police would arrest her for being a Christian. In her November 2014 application, Zheng stated, "I am afraid that the Chinese government will arrest and detain me for being a Christian. When I am imprisoned, [I] will be tortured for my religious beliefs. They will beat me and starve me, they will inflict bodily harm on me." Admin. R. at 1258.

Beginning on September 23, 2014 and ending on February 6, 2015, a merits hearing was held before the IJ on Zheng's application. Zheng was represented by counsel and called four witnesses to testify in support of her application for relief from removal. She also submitted to the immigration court three virtually identical letters purportedly one from each of her three sisters.

The first witness, Hok Kong Lam, testified that he has known Zheng's husband for more than ten years, having been his business partner in the United States. Lam, however, had never met Zheng personally. When asked whether he knew the reason why Zheng came to the United

States, Lam said that Zheng had a "problem with her church . . . when she was in China." *Id.* at 853-54.

The second witness, Mei Wang, testified that she met Zheng through Wang's jail ministry group while Zheng was imprisoned in Battle Creek, Michigan in May 2014.[1] Since then, Wang met with Zheng six times at the detention facility where they discussed "God's teaching, that kind of thing." *Id.* at 893-94. Wang learned from Zheng that Zheng's son was arrested in China "[b]ecause he went to church." *Id.* at 898. Wang also testified that Zheng was a "true believer in Christianity," even being baptized by Wang's church while in detention. *Id.* at 899-900.

Zheng's husband, Hong Xiang Chen, testified next. Chen testified that his wife and son participated in a church in China and that their son was arrested and detained for fifteen days because of it. Chen said his wife came to the United States "because of our son, in the future, he would be persecuted again." *Id.* at 918. Chen also said that Zheng feared being arrested by the police because she passed out flyers for her church.

Yu Fan, Zheng's son, also testified on Zheng's behalf. Yu Fan explained that he was arrested in China in February 2014 for participating in an underground Christian church at his friend's house. He said the police took him to the precinct where they told him the gathering was illegal and beat him with a book and a baton. The police then asked Yu Fan for the name of his pastor and asked who else participated in the church group. But Yu Fan did not give the police any of this information, despite being detained for fifteen days and "beat up at least six or seven times." *Id.* at 942. When he was released from custody, Yu Fan went home and told Zheng that he refused to give the police any information.

Zheng testified after Yu Fan was excused. She said she feared returning to China because the police would arrest her for practicing Christianity. When the IJ asked Zheng which particular branch of Christianity she follows, Zheng replied, "I just believe in God. I just start to believe in God, so I am not clear." *Id.* at 954. Zheng explained that she joined the Christian Hua

---

[1]Throughout the immigration process, Zheng was detained by DHS at a detention facility in Calhoun County, Michigan.

Xiang Church in Fuzhou, China in November 2013, and that the church is comprised of about forty or fifty participants. Zheng said she handed out flyers for the church "once a while, but not often," even though she did not know what those flyers actually said. *Id.* at 958.

Zheng testified that she had never been arrested by the police for practicing Christianity. But her son, on the other hand, was arrested for participating in "his friend's house church." *Id.* at 961. Zheng also said that she and her son belonged to different church groups. When the IJ asked Zheng why she stated in her asylum application that she and her son attended the same church group, Zheng answered, "Because I was locked up here for nine months, maybe I made a mistake. I forgot." *Id.* at 970.

On cross-examination, when counsel for the DHS asked Zheng whether her sisters could write, Zheng replied, "They did not study much and I haven't seen them write anything at all." *Id.* at 1001. Zheng also said that she was unaware her sisters had submitted letters on her behalf. Counsel for the DHS also asked Zheng about three visa applications she had submitted in 2012 and 2013 to come to the United States. In one of the forms submitted in connection with the application, Zheng stated that she attended high school and owned a furniture store in China. However, Zheng admitted that this information was false and explained that someone else filled out the form for her.

Later, on redirect, Zheng stated that the police in China knew about her religious beliefs because Yu Fan told the police she was a Christian. But the IJ informed Zheng that Yu Fan did not say that when he testified on direct examination. Zheng then said that "[m]aybe [Yu Fan] forgot to say [that] in his testimony, but he did come home and tell me." *Id.* at 1038.

The DHS then recalled Yu Fan to testify. This time, Yu Fan said he told the police Zheng was a Christian, even though he knew doing so would risk her also being arrested and beaten. Yu Fan also said he told Zheng that the police knew she was a Christian. He then testified that while he knew Zheng's sisters had submitted letters on her behalf, he was not the one who requested those letters. The IJ then asked Yu Fan whether anything else happened in China after his arrest, to which Yu Fan replied, "No, that's it." *Id.* at 1055. But the IJ pointed out that Yu Fan told the asylum officer in his separate credible-fear interview that after his

release, the police came looking for him at his workplace and that he lost his job.  The court then heard argument from the parties before concluding the hearing.

In a twenty-eight page opinion, the IJ summarized the hearing testimony, laid out the applicable law, determined that Zheng lacked credibility, and held that the evidence Zheng presented—i.e., the three letters purportedly from Zheng's sisters—was insufficient corroborative evidence to support her claims.  The IJ denied the application and ordered Zheng removed to China.  Zheng appealed, and the BIA concluded that she did not meet her burden of proving eligibility for asylum, withholding of removal, and protection under the CAT.  This petition for review followed.

## DISCUSSION

## I.        The IJ's Adverse Credibility Determination and Finding on Past Persecution

### a.        Standard of Review

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).  But where, as here, the BIA "adopts the IJ's decision and supplements that decision with its own comments," we review both opinions.  *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011).

Although questions of law are reviewed *de novo*, we give deference to the BIA's interpretation of the Immigration and Nationality Act and accompanying regulations.  *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008).  Factual findings, including those relevant to "credibility determinations, denial of asylum applications, withholding of removal, and the CAT," are reviewed for substantial evidence.[2]  *Id.*  Under this deferential standard, we will "uphold a BIA determination as long as it is supported by reasonable, substantial, and probative

---

[2]The REAL ID Act of 2005 applies to applications for asylum, withholding of removal, and CAT relief filed on or after May 11, 2005.  *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009).  This act permits the IJ to consider "any inaccuracies or falsehoods [in an applicant's] statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014) (alteration in original) (internal quotation marks omitted). Therefore, an adverse credibility determination could be fatal to an applicant's claims for asylum, withholding of removal, and protection under the CAT.  *Id.*

evidence on the record considered as a whole." *Parlak v. Holder*, 578 F.3d 457, 462 (6th Cir. 2009) (internal quotation marks omitted). The BIA's factual findings are conclusive "unless the Court finds that any reasonable adjudicator would be compelled to conclude to the contrary." *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010) (internal quotation marks omitted).

### b.       *Legal Framework*

"To establish eligibility for asylum, an applicant must establish he is a 'refugee' within the meaning of" the statute. *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009). The term "refugee" is defined as a person "who is unable or unwilling to return to . . . [his] country [of nationality] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). To meet the definition of a refugee, a person must show that one of the aforementioned protected grounds "was or will be at least one central reason for" his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). "The asylum applicant who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution." *Ouda v. I.N.S.*, 324 F.3d 445, 452 (6th Cir. 2003).

However, without evidence of past persecution, the asylum applicant must "prove a well-founded fear of future persecution." *Allabani v. Gonzales*, 402 F.3d 668, 674 (6th Cir. 2005). To do this, the applicant must show that he "actually fear[s] that he will be persecuted upon return to his country, and he must present evidence establishing an objective situation under which his fear can be deemed reasonable." *Id.* (internal quotation marks omitted). "The applicant need not demonstrate that he will probably be persecuted if returned because one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Selami v. Gonzales*, 423 F.3d 621, 625 (6th Cir. 2005) (internal quotation marks omitted).

In order to qualify for withholding of removal, the applicant must establish that there is a "clear probability" that he will be subject to persecution if forced to return to the country of removal. *Gilaj v. Gonzales*, 408 F.3d 275, 289 (6th Cir. 2005) (per curiam). A "clear

probability" in this context means that the applicant would "more likely than not" be subject to persecution. *Al-Ghorbani v. Holder*, 585 F.3d 980, 993-94 (6th Cir. 2009).

It is more difficult to obtain withholding of removal than it is to obtain asylum because "[t]he burden of proof for withholding of removal is more exacting than that for asylum." *Lumaj v. Gonzales*, 462 F.3d 574, 578 (6th Cir. 2006). Therefore, if an applicant fails to satisfy the lower burden of proof for asylum, it follows that he also fails to satisfy the higher burden required for withholding of removal. *See Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004).

To qualify for CAT relief, an applicant must establish that it is "more likely than not" that he would be tortured if deported to the country of removal. *Zhao v. Holder*, 569 F.3d 238, 241 (6th Cir. 2009) (citing 8 C.F.R. § 1208.16(c)(2)). "Torture, in any of its myriad manifestations, must entail the intentional infliction of severe mental or physical pain upon an individual by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Alhaj v. Holder*, 576 F.3d 533, 539 (6th Cir. 2009) (internal citations and quotation marks omitted). If the IJ determines the applicant's testimony is incredible, then the applicant cannot rely on his discredited testimony to meet his burden for CAT relief. *Slyusar*, 740 F.3d at 1074.

### c.    *The Adverse Credibility Determination*

Both the IJ and BIA determined that Zheng failed to provide credible testimony or sufficient corroboration. The IJ and BIA therefore concluded that Zheng failed to satisfy her burden of proving eligibility for either asylum or withholding of removal and that she also failed to demonstrate that it is more likely than not that she would be tortured if removed to China.

Zheng's application for asylum is based entirely on her claim that she feared returning to China because the police would arrest her for practicing Christianity. In support of her assertion that the Chinese police knew she was a Christian, Zheng testified that her son, Yu Fan, told the police she was a Christian. But when Yu Fan first testified, he said he refused to give the police any information concerning who else was a Christian—despite being detained for fifteen days and "beat up at least six or seven times." Admin. R. at 942. Only in cross-examination—and only after being recalled to testify—did Yu Fan change his testimony to say that he gave up his

mother (but no one else), even though he knew doing so would risk her also being arrested and beaten.  We see no basis to reject the IJ's reliance on this inconsistency as one factor in making the adverse credibility finding.

But this was far from the only inconsistency the IJ relied on.  The IJ pointed to many discrepancies in Zheng's testimony to support her adverse credibility determination.  For one, Zheng argues that her Christian beliefs will subject her to persecution if returned to China.  Yet Zheng hardly knew anything about Christianity, even telling the asylum officer in her credible-fear interview that she "ha[d] no idea" why she was a Christian, *see id.* at 1309, and later testifying that she could not "remember anything that was taught at [her] church in China," *id.* at 1007.  In fact, the few things Zheng did know about Christianity were things she learned while jailed in the United States.  By her own admission, Zheng "only distributed flyers" for a church in China and was never even caught by the police—much less arrested—for doing so.  *Id.* at 1309.  And, when the IJ asked Zheng which particular branch of Christianity she follows, Zheng replied, "I just believe in God.  I just start to believe in God, so I am not clear." *Id.* at 954.

The IJ also cited the discrepancies among Zheng's asylum application and her testimony. Zheng's written application stressed that she feared returning to China because she and Yu Fan "were part of a Christian church group" in China.  *Id.* at 1258.  She also wrote in her application, "My son and I are still both Christians but *we* are no longer participating in *our* old church group in China." *Id.* (emphasis added).  But at the hearing, both Zheng and Yu Fan testified that they belonged to different church groups.

These are not minor inconsistencies, as Zheng characterizes them.  Rather, these inconsistencies went to the heart of Zheng's claim because they concerned the very reason why she feared persecution and fled.  Yet, even if these inconsistencies were minor, the BIA's decision should still be upheld because "under the REAL ID Act, even ancillary inconsistencies in a petitioner's testimony support adverse credibility determinations." *Slyusar*, 740 F.3d at 1073; *see also Yong Xing Deng v. Holder*, 572 F. App'x 331, 333 (6th Cir. 2014) (per curiam) (upholding adverse credibility determination based on minor inconsistencies).

At a minimum, Zheng demonstrated little knowledge about the basic teachings of Christianity, and the IJ was understandably reluctant to accept her testimony about her religious persecution.　While the law does not require that an applicant possess the knowledge of a religious scholar to claim persecution based on religion, the IJ could certainly consider Zheng's lack of knowledge when evaluating her testimony about religious persecution.　*See, e.g., Ming Juan Chen v. Holder*, 389 F. App'x 468, 471-72 (6th Cir. 2010).

Notwithstanding Zheng's lack of credibility, the IJ went on to examine the corroborating evidence Zheng submitted.　The IJ reviewed three undated letters purportedly from Zheng's three sisters.　Each letter is virtually identical to the first.　In fact, each letter states, verbatim:　"During the detention [Yu Fan] . . . was traumatized both mentally and physically."　Admin. R. at 1087, 1093, 1099.　However, according to their testimony, neither Zheng nor Yu Fan had requested that those letters be submitted for the record on Zheng's behalf.　Moreover, when asked on cross-examination whether her sisters could write, Zheng replied, "They did not study much and I haven't seen them write anything at all."　*Id.* at 1001.　In any event, the letters did not describe any harm Zheng suffered at the hands of the police, instead discussing only what happened to Yu Fan.　Under these circumstances, the IJ properly gave little weight to Zheng's corroborating evidence.

The bottom line is that Zheng has not presented evidence or any argument that would compel a reasonable adjudicator to disagree with the IJ's finding.　*See, e.g., Bi Xia Qu*, 618 F.3d at 606.　And because Zheng based her CAT claim on the same grounds as her asylum and withholding claims, the IJ and BIA properly found that Zheng had not met her burden of proof with respect to her CAT claim.　*See Pilica v. Ashcroft*, 388 F.3d 941, 954-55 (6th Cir. 2004) ("Because [the petitioner's] testimony plausibly could be viewed as incredible, and certainly could be viewed as inconsistent or incoherent, a fact finder reasonably could find that [the petitioner's] testimony, absent corroboration, was insufficient to meet his burden of proof.").　Because this determination is supported by substantial evidence, and no reasonable adjudicator would be compelled to come to a contrary determination, the record does not compel reversal of the BIA's decision.

## II.      Zheng's Due Process Violation Claim

"Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001). We review *de novo* alleged due process violations in removal hearings. *Hassan v. Gonzales*, 403 F.3d 429, 435 (6th Cir. 2005).

When reviewing alleged due process violations in removal hearings, we must determine "whether there was a defect in the removal proceeding . . . [and] whether the alien was prejudiced because of it." *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005). Because "proof of prejudice is necessary to establish a due process violation in an immigration hearing," *id.*, "we need not address the merits of a [due process] claim if" the petitioner fails to demonstrate prejudice. *Graham v. Mukasey*, 519 F.3d 546, 549 (6th Cir. 2008); *see also Ikharo v. Holder*, 614 F.3d 622, 631 (6th Cir. 2010), *vacated on other grounds*, 132 S. Ct. 997 (2012).

"[T]o establish the requisite prejudice, [the petitioner] must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations." *Graham*, 519 F.3d at 549-50; *see Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007) ("An alien must establish . . . substantial prejudice to prevail on a due process challenge to deportation proceedings.") (internal quotations omitted). Therefore, reviewing an alleged due process violation is a two-step inquiry: first, whether there was a defect in the removal proceeding; and second, whether the petitioner was prejudiced because of it.

Petitioners in immigration proceedings also "are entitled to an unbiased arbiter who has not prejudged their claims." *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005). Immigration judges are statutorily empowered to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). While immigration judges have "broad discretion in conducting their hearings," *see Ahmed*, 398 F.3d at 725, they must carefully exercise such power to ensure that their positions as neutral arbiters do not take on that of advocates. As the BIA has explained:

[An IJ] must be impartial and must not attempt to establish proof to support the position of any party to the controversy; once he does so he becomes an advocate or a participant, thus ceasing to function as an impartial trier of fact, and a hearing so conducted is lacking in the fundamental fairness required by due process.

*Vasha*, 410 F.3d at 872-73 (quoting *Matter of Lam*, 14 I. & N. Dec. 168, 170 (B.I.A. 1972) (alteration in original)).

In the instant case, Zheng has presented little evidence of bias. In her brief, Zheng repeatedly makes accusations that the IJ was fundamentally unfair and lacked impartiality by questioning her about the three fraudulent visa applications she had submitted in 2012 and 2013 to come to the United States. She also claims the visas were improperly admitted into evidence.

It is well-established that removal proceedings are not subject to the Federal Rules of Evidence. *Singh v. Ashcroft*, 398 F.3d 396, 406-07 (6th Cir. 2005). Accordingly, we "review evidentiary rulings by IJs only to determine whether such rulings have resulted in a violation of due process." *Id.* at 407.

Zheng admitted on cross-examination that the information she submitted in connection with her visa applications to visit the United States was false and explained that someone else filled out the forms for her. Zheng provided no other explanation for submitting false information. In the IJ's view, Zheng's submission of fraudulent documents impeached her general credibility, and the IJ relied upon this in reaching her adverse credibility determination. We see no error in the IJ's reasoning in this regard. *See, e.g., Borovikova v. U.S. Dep't of Justice*, 435 F.3d 151, 157-58 (2d Cir. 2006) (holding that a petitioner's submission of fraudulent documents alone can form the basis of an adverse credibility determination). This is especially true in light of the fact that the IJ's lengthy opinion noted a number of other inconsistencies that led to her finding that Zheng was not credible. *See Ndrecaj v. Mukasey*, 522 F.3d 667, 673 (6th Cir. 2008) (finding no due-process violation where there was "no evidence that [the IJ] did not fairly consider the [petitioner's] evidence" and "[t]he IJ gave a detailed description of all of the inconsistencies that he identified and then explained how those inconsistencies supported his finding that [the petitioner] was not credible").

Moreover, contrary to Zheng's claim, her submission of fraudulent visa applications does go to the heart of her asylum claim because it calls into question her true motivation for coming to the United States. Zheng's entry into the United States came just one year after she submitted her visa application, and she had no intention of seeking religious asylum at that time. This evidence tends to disprove Zheng's claim that she fears future persecution were she to return to China. And regardless, Zheng makes no real claim that her proceedings would have differed in any way had the IJ not considered the visa applications. We therefore conclude that Zheng did not suffer any prejudice from the IJ's consideration of her visa applications.

Lastly, we find no merit to Zheng's claim that the DHS withheld evidence from her. Although this part of Zheng's brief is somewhat difficult to decipher, Zheng seems to claim that the DHS refused to provide to her all of the information it had about the three visa applications she submitted in 2012 and 2013. Over Zheng's objection, the IJ admitted the fraudulent visas into evidence. However, it is clear from reading the record that the DHS gave to Zheng everything it intended to introduce as evidence:

| [Zheng's counsel]: | Judge, because of the - because we don't have the full record - we have bits and pieces - from what I'm seeing from these bits and pieces - |
|---|---|
| [DHS' counsel]: | Your honor, the government objects to that. The government has already stated this is the full record. |
| [Zheng's counsel]: | The government also stated that they refused to give us the full record, so if I could finish without interruption? |
| [DHS' counsel]: | The government never stated that, your honor, and I object that they have the record. |
| [Zheng's counsel]: | Judge, if I could finish without interruption? |
| [DHS' counsel]: | The government never stated that they refused – |

Admin. R. at 801.

Even if due process requires more, *see Dent v. Holder*, 627 F.3d 365, 374 (9th Cir. 2010) (finding that petitioner should have been given access to his A-File), the fact remains that Zheng has failed to show that access to further information would have led to a substantially different

outcome.  Because none of her alleged due process violations affected the outcome of her claim, Zheng did not suffer any prejudice.  Therefore, the IJ did not violate Zheng's right to due process.

## CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.