05-0136-ag
Niang v. Mukasey

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2006

(Submitted: June 15, 2007                    Decided: December 19, 2007)

Docket No. 05-0136-ag

SOULEYMANE NIANG,

*Petitioner*,

MICHAEL B. MUKASEY,[*]

*Respondent.*

Before: LEVAL, CALABRESI, and GIBSON,[**] *Circuit Judges*.

Petition for review of an order of the Board of Immigration Appeals ("BIA") denying petitioner's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

Vacated in part, and remanded.

> Morry Cheng, New York, N.Y., *for Petitioner*.
>
> Pravin Rao & Craig Oswald, Assistant United States Attorneys *for* Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, Chicago, Ill., *for Respondent*.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General John Ashcroft as Respondent in this case.

[**] Judge John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

CALABRESI, *Circuit Judge*:

Souleymane Niang ("Niang" or "petitioner"), assertedly a native and citizen of Mauritania, petitions this Court for review of a December 22, 2004 order of the BIA. The BIA affirmed the decision of Immigration Judge ("IJ") William P. Van Wyke, pretermitting Niang's application for asylum, and denying his claims for withholding of removal and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. *In re Souleymane Niang*, No. A 96 169 373 (B.I.A. Dec. 22, 2004), *aff'g* No. A 96 169 373 (Immig. Ct. N.Y. City Nov. 19, 2003). Niang claimed that he and his family were violently expelled from Mauritania on account of their race. The IJ, relying on his conclusion that Niang had submitted identity documents that were not genuine, found that petitioner's testimony was not credible, and decided that Niang had not met his burden of proof. The BIA upheld the IJ's adverse credibility determination, and held, moreover, that country conditions in Mauritania had changed such that Niang no longer faced a risk of persecution.

We hold that where, as here, an applicant's testimony is otherwise credible, consistent and compelling, the agency cannot base an adverse credibility determination solely on a speculative finding that the applicant has submitted inauthentic documents in support of his application. In addition, we reiterate that, where an applicant for withholding of removal establishes past persecution, but the agency finds a fundamental change in country conditions, the agency must provide a reasoned basis, tethered in the record, for its changed country conditions determination,

unless undisputed historical facts support the conclusion that the applicant will not face persecution on removal.

## BACKGROUND

Petitioner entered the United States at JFK Airport on August 16, 2001, after presenting a Senegalese passport and student visa belonging to a man named Mamadou Ba. In February 2003, Niang applied for asylum, withholding of removal, and CAT relief. On his I-589 application, Niang claimed that his home country was Mauritania, and that he was a member of the Fulani ethnic group. Petitioner wrote that he was "very afraid" to return to Mauritania, or to Senegal, where he had been living since 1989, believing that he would there be arrested or killed.

Niang was then served with a Notice to Appear to face removal proceedings before an IJ in Cincinnati. He conceded removability at a Master Calendar hearing in Detroit, where the IJ acceded to Niang's request to move the case to New York City.

**I. The Hearing**

A. Niang's Testimony

IJ William P. Van Wyke heard the merits of Niang's claim on November 19, 2003, in the Immigration Court in New York. Niang was the only witness. He told the IJ that he left Mauritania in December 1989, when he was twelve years old, and that he had never been back. In 1989 and 1990, ethnic tensions in southern Mauritania culminated in mass expulsions, and petitioner claimed

to be a victim of this purge. When asked by the judge how he left Mauritania, petitioner said that "white militaries" came to his family's home and told them to leave. When his father spoke out, the soldiers beat him heavily and tied him up. When Niang's brother resisted, he was shot and killed. Niang claimed that he, his parents and his sister were next jailed for ten days, and then taken across the river to Senegal and ordered never to return. According to Niang, the Mauritanian authorities told his family that they did not belong in Mauritania, made his parents sign papers promising never to re-enter the country, and said that they would be killed or imprisoned if they came back.

Once in Senegal, the Niang family went to a refugee camp. Two months later, petitioner's father died from the beating he had received. Niang said that the deaths of his father and brother were "too much" for his mother, who died a year later. This left Niang and his younger sister living in the camp. In 1994, when petitioner was about sixteen, he heard that life in Dakar was better than life in the camp, so he set off with three friends on the "very hot and strenuous" road to the Senegalese capital; he left his sister behind. Niang testified that he has not seen her since. When he got to Dakar, he was disappointed; lacking documentation that would authorize him to work legally, he did menial jobs for a wealthy family who paid him with food.

Petitioner stated that, after he had been living in Dakar for a number of years, he heard a report that anyone in Senegal who was from Mauritania was to be sent back there. According to Niang, he got help from Mamadou Ba, a son of the family for which he worked. Ba had an F-1 visa to come to the United States. He gave his passport and visa to Niang, who pretended to be Ba when entering the country. After arriving in America, he mailed the passport back to Ba in Senegal.

B. The Identity Documents

In addition to Niang's testimony, the IJ admitted various pieces of documentary evidence into the record. Two items are particularly significant to Niang's petition for review: (1) a copy of a Mauritanian identity document, and (2) a Senegalese refugee identity card.[1] Both were proffered by Niang to show that he was a Mauritanian refugee. The government's cross-examination, and, ultimately, the IJ's decision, centered largely on the provenance and veracity of these papers.

*1. The Mauritanian Identity Document*

Petitioner submitted a copy of his putative Mauritanian identity document. It lists, among other things, petitioner's name, his place of birth, and his date of birth: July 30, 1977. Printed in French and Arabic, it indicates that Niang's nationality is "Mauritanienne." The Mauritanian identity document was purportedly issued on January 25, 1989, and opposite the word "profession" is the word "commerçant." At the bottom, there is a photograph, apparently of Niang, flanked on one side by a fingerprint, and on the other side by a signature, which reads "Souleyman" or "Souleymane."

Niang stated that the card was issued by the government of Mauritania, and obtained by his father, before his family was expelled: "It's my dad that had made it when we lived in Mauritania and he made it through the government." Challenged to explain why the holder's profession was apparently recorded as "commerçant," even though Niang was only eleven years old at the time of issue, Niang replied that his father was a merchant. Petitioner said that when they went to Senegal, his mother had custody of the document, and that after she died, he himself carried it around in his

---

[1] In addition to the two identity documents, the IJ admitted to the record the State Department's Country Reports on Mauritania for 2000 and 2002, and other sources on conditions in Mauritania.

pocket. The original picture faded and the document itself became "almost torn," so Niang took it to the head of the refugee camp. The camp head took it from him, replaced the picture with a new one, made photocopies of the document, and gave a copy to Niang. That was the last Niang saw of the original.

When asked by the judge how old he was in the picture on the Mauritanian identity document, Niang replied that he was about sixteen years old. The IJ inquired of Niang why two different typewriters had apparently been used for different parts of the document; petitioner responded that he did not know how it was made. Niang said that he left the Mauritanian identity document photocopy with his friend Mamadou Ba, who had advised him not to travel with documents indicating two different identities (the identity papers and Ba's passport). After arriving in the United States, Niang called Ba in Senegal and had him fax it to America.

*2. The Senegalese Refugee Identity Card*

The second crucial document admitted into evidence by the IJ is the Senegalese refugee identity card. Petitioner submitted the original of this document to the Immigration Court. Like the Mauritanian identity document, the Senegalese refugee identity card states petitioner's place and date of birth. It, too, has a photograph, again apparently of Niang, but different from the picture on the Mauritanian identity document. It was stamped on January 31, 2002.

Niang claimed he was first issued with such a card shortly after he and his family arrived at the refugee camp. Though petitioner himself sometimes had possession of his refugee identity card, he generally left it with the head of the camp so that he would not lose it. When the judge asked Niang how old he was in the picture on the Senegalese refugee identity card, Niang said: "Like 12."

The government attorney alleged that Niang had a mustache when the photograph was taken. Niang denied that claim, saying "maybe it's the picture is like that." Niang asserted that he left the refugee card behind when he left the camp in 1994. But when applying for asylum in the United States, he remembered the card. He wrote to Ba and asked him to retrieve it. At Niang's request, Ba approached the head of the refugee camp, who at that time was in Dakar trying to raise money. Armed with the photocopy of Niang's Mauritanian identity document, Ba succeeded in obtaining the Senegalese refugee identity card, and mailed it to Niang in the United States.

## II. The IJ's Decision

The IJ rendered his decision orally at the close of the hearing. He rejected the application in its entirety, and ordered Niang removed from the United States.

With respect to the asylum claim, the IJ found that petitioner had filed it more than one year after his entry into the United States. Because Niang was unable to show any exceptional circumstances justifying the late filing, the IJ pretermitted the application insofar as it claimed asylum.

The IJ then denied Niang's claims for withholding under 8 U.S.C. § 1231(b)(3) and the CAT. He held that Niang had failed to meet his burden of proving that he had been persecuted in the past or would be persecuted or tortured if removed. In short, the IJ did not believe that Niang was who he said he was. This adverse credibility determination was not based on the IJ's assessment of Niang's demeanor. The IJ, admirably, made this clear: "When demeanor doesn't cause any concern or problem with me, I like to say that. That's the case here. . . . I felt that his manner of speaking was totally consistent with somebody who had lived through what he said he did." Instead, the IJ's

reasons for disbelieving Niang concerned the identity documents. Though the IJ accepted that petitioner's name was Souleymane Niang, he doubted that the identity documents were genuine.

The judge seemed to rely on four reasons for finding that the documents, and Niang's testimony about them, were not credible. First, the IJ did not credit Niang's explanation of how he came to have the Senegalese refugee document. It seemed "rather unlikely" that an identity document "would not be held by the person it identifies." Moreover, it was "farfetched" for Niang to say that he had "never seen" the refugee document while he was there, and then to say that he wanted to be sure to get a copy after he left. Second, the IJ determined that Niang's testimony concerning his age in the photographs was inaccurate. The IJ seemed to think that Niang claimed to be twelve in both pictures. The IJ accepted that he was "not an expert in forensics or development of children or anything like that," but thought such expertise unnecessary in this case. Speaking of the picture on the Mauritanian identity document, in which Niang actually claimed to be sixteen, the IJ stated: "[I]t's a mature man's face. It's not a child." And, as to the Senegalese refugee identity card, where the IJ did not accept the government's contention that the person in the photograph had a mustache, he nevertheless concluded that "this is older than a 12-year-old." Third, the Mauritanian identity document had "very clearly" been altered, although it was "conceivable" the changes were made in the refugee camp. Fourth, the IJ found it questionable that the Mauritanian identity document indicated that Niang was a "businessman or commercial figure." For all these reasons, the IJ decided that neither document was genuine.

From this finding on the documents, the IJ concluded that Niang had not testified "correct[ly] or truthfully about them." Given this "crack in the vase," the IJ determined that Niang's testimony was not credible. He reached this decision "with a little bit of misgivings" because he didn't "see

[or] hear anything in his testimony itself that sounds made up." Nevertheless, he thought "a different explanation of the documents would come or different documents would be here if he were telling the whole truth." Refusing to accept Niang's story, the IJ denied the withholding and CAT claims for failure to meet the burden of proof.

Lastly, the IJ concluded that, assuming Niang had suffered persecution in Mauritania, conditions there had not fundamentally changed such that his life or freedom would no longer be threatened. The evidence from the State Department was conflicting; though there were some indications that people were returning, Mauritania still had "a very bad human rights record."

**III. The BIA's Decision**

On December 22, 2004, the BIA adopted and affirmed the IJ's decision pretermitting Niang's asylum application as untimely. In addition, the BIA held that the IJ correctly determined that Niang had failed credibly to establish his identity. The Board found no error in the IJ's determination that Niang had not carried his burden of proving that he possessed a likelihood of future persecution if he returned to Mauritania. In one respect, however, the BIA seemed to go further than the IJ, noting "that the record indicates that the current situation in Mauritania has improved dramatically, lessening the likelihood of persecution." Accordingly, the Board dismissed Niang's appeal.

This petition for review of the agency's denial of Niang's withholding and CAT claims followed.[2]

---

[2] Niang does not challenge the agency's finding that his asylum claim was untimely filed.

DISCUSSION

Where, as here, the BIA adopts the decision of the IJ, and supplements that decision, this Court reviews the decision of the IJ as supplemented by the BIA. *See Yan Chen v. Gonzales*, 417 F.3d 268, 275 (2d Cir. 2005).

**I. Past Persecution**

A. The Adverse Credibility Finding

The petition attacks the IJ's findings that Niang submitted identity documents that were not genuine, and that he testified untruthfully about them. Finding various errors in the reasoning leading to the IJ's adverse credibility decision, we vacate and remand that finding.[3]

This Court reviews the agency's factual findings, including its adverse credibility determinations, under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Nevertheless, the court will vacate and remand for new findings if the agency's reasoning or its fact-finding process was sufficiently flawed. *See Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 406 (2d Cir. 2005); *Tian-Yong Chen v. INS*, 359 F.3d 121, 129 (2d Cir. 2004). An adverse credibility determination must be based on "specific, cogent reasons" that "bear a legitimate nexus" to the finding. *Secaida-Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003) (internal quotation marks and citations omitted).

---

[3] Petitioner contends that the IJ failed even to make an adverse credibility finding, but it is tolerably clear that the IJ relied on Niang's statements about the documents to find his testimony incredible as a whole.

Particular deference is given to the trier of fact's assessment of demeanor. *See Majidi v. Gonzales*, 430 F.3d 77, 81 n.1 (2d Cir. 2005). To his credit, the IJ expressly stated that he found no fault with Niang's demeanor. Petitioner's "manner of speaking" was, in the eyes of the IJ, "totally consistent with somebody who had lived through what he said he did." Thus, one of the most powerful reasons to defer to an IJ's adverse credibility finding is absent in this case. *See Wensheng Yan v. Mukasey,*— F.3d —, 2007 WL 4233379, at *3 (2d Cir. Dec. 4, 2007) (stressing the importance of witness demeanor as a reason for appellate courts to give deference to a fact-finder's analysis of testimony) ; *see also Zhou Yun Zhang v. INS,* 386 F.3d 66, 73 (2d Cir. 2004), *overruled in part on other grounds, Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 305 (2d Cir. 2007) (en banc).

The IJ relied solely on his own finding of document fraud to reach the conclusion that Niang was not credible. The IJ acknowledged that he was not an "expert" on forensics, but this alone does not render his decision suspect. Though often helpful, an expert report will not be necessary in every case to support a finding that a document is fraudulent. An IJ is fully entitled to make findings concerning the authenticity of submitted evidence, based on her own examination and her professional analysis. Such findings will ordinarily merit deference. *See, e.g., Borovikova v. U.S. Dep't of Justice,* 435 F.3d 151, 157-58 (2d Cir. 2006). But we have refused to credit the IJ's finding that submitted documents were false when we have determined that the IJ based his conclusion on unjustified assumptions and engaged in unsupported speculation. *See Li Zu Guan v. INS*, 453 F.3d 129, 139 (2d Cir. 2006) (citing *Secaida-Rosales*, 331 F.3d at 297).

Certainly, the BIA has found that an IJ may appropriately base an adverse credibility finding on the fraudulent submission of a document. *See Matter of O-D-*, 21 I. & N. Dec. 1079, 1082-83

(B.I.A. 1998). And we have approved such reasoning, where the agency relied on a firmly grounded expert finding of document fraud to reach the conclusion that an applicant was dissembling in her oral testimony. *Borovikova*, 435 F.3d at 157-58. Moreover, we recently held in *Siewe v. Gonzales*, 480 F.3d 160 (2d Cir. 2007), that "*[f]alsus in uno* is a natural and instinctive tool of the factfinder, like a carpenter's hammer or plumber's wrench," *id.* at 171, and "a single false document or a single instance of false testimony may (*if attributable to the petitioner*) infect the balance of the alien's uncorroborated or unauthenticated evidence." *Id*. at 170. (emphasis added). But neither in *Borovikova* nor in *Siewe* did we hold that concerns about document authenticity, as contrasted with a valid finding of fraud, could provide a sufficient basis for discrediting an applicant's otherwise credible testimony. As the Seventh Circuit has noted, there is a "gaping hole" between a finding that a document submitted by an applicant is not authentic, and a holding that the witness's testimony is invented. *Kourski v. Ashcroft*, 355 F.3d 1038, 1039 (7th Cir. 2004). That hole, all the more gaping where the petitioner's testimony and demeanor support his case, can only be bridged where the fact-finder has reason to believe that the applicant knows or suspects that the document is false. *Id.* at 1040 ("[I]f the applicant has no reason to know that the document is forged, its existence does not undermine his credibility . . . .").

In the instant case, the record does not provide a substantial basis for concluding that Niang's identity documents undermine his credibility. The IJ's decision was infected by several errors of reasoning. As noted above, the IJ appeared to base his determination that the documents in question were fraudulent on four stated reasons. Each of these is in some way problematic.

First, the IJ appeared to mischaracterize Niang's testimony as to how he had come to possess the Senegalese refugee identity card. Contrary to the IJ's decision, Niang did not say that he had

"never seen" that document. Rather, he claimed only that he had generally left it in the custody of the refugee camp authorities so that he would not lose it, and that he took possession of it when he needed it. This error severely undermines the IJ's conclusion that it was "farfetched" that Niang would later recall the existence of the card. Additionally, it is not inherently "unlikely" that an identity document would not always be held by the person it identifies, but would instead be held for safekeeping by the refugee camp authorities that issued it, particularly where the holder is an orphaned child living in the camp. Hence, the IJ's rejection of Niang's explanation for the provenance of the document does not comport with our requirement that the agency "give specific, cogent reasons for rejecting the petitioner's testimony." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir. 2004) (internal quotation marks omitted).

Second, the IJ misunderstood or misremembered Niang's testimony concerning his age in the photographs, erroneously lumping together two different pictures. Apparently assuming that Niang claimed to be twelve years old in the picture on the Mauritanian identity document, the IJ concluded that the picture was in fact of a "mature man." In fact, Niang claimed unequivocally to be sixteen years old in that picture. This leaves intact the IJ's skepticism as to Niang's age in the picture on the Senegalese refugee identity card, in which Niang did in fact claim to be twelve. But the IJ conceded that he was not an expert in child development, and noted that he did not see a mustache. More importantly, this finding may well have been influenced by the IJ's error as to Niang's testimony concerning his age in the other picture.

Third, the IJ's finding that the Mauritanian identity document had "very clearly" been altered, because more than one typewriter had apparently been used in its construction, provides only scant support for his finding of document fraud. Niang himself stated straight out that the document had

been altered by the replacement of its picture, and allowed that, at the same time, the camp authorities may have also made changes to its text. The IJ noted this explanation, but discounted it without more. Of all the IJ's reasons for doubting the documents, this was perhaps the best. But, as evidence that Niang *himself* knew he was submitting a fraudulent document, the fact that more than one typewriter might have been used is, in the full context of this case, insufficient.

Finally, the IJ's reliance on the fact that the word "commerçant" appears on the Mauritanian identity document was also based on a mistaken assumption. The hearing transcript shows that the IJ misunderstood Niang to have testified at one point that the identity card belonged to his father, rather than to Niang himself. Niang in fact testified that his father had obtained the card from the Mauritanian government on his behalf and that the profession indicated on the card was that of his father. There is no indication that in reaching his decision the IJ considered Niang's explanation. *See Cao He Lin*, 428 F.3d at 403 (emphasizing that an IJ is not required to credit an applicant's explanations even if they appear plausible on a cold record, but is required to take the explanations into account).

At most, when taken together and cured of factual errors, the IJ's speculations support suspicions that the documents were not genuine. But, given the tenuousness of these suspicions, they cannot ground an adverse credibility determination, where petitioner's testimony was otherwise convincing and consistent, and where the IJ stated expressly that he heard nothing that "sounded made up." Accordingly, we find that the IJ's adverse credibility finding was not supported by substantial evidence.

B. Corroboration

The government contends, nevertheless, that remand would be futile. It relies on an alternative ground, not specifically mentioned by the BIA, but, according to the government, implicit in its decision: that Niang provided inadequate corroborative evidence in support of his claims. This argument, too, however, is unavailing. *Cf. Kyaw Zwar Tun v. INS*, 445 F.3d 554, 567-68 (2d Cir. 2006) (refusing to accept an IJ's adverse credibility determination, but denying review on the alternative basis that the applicant failed to present reasonably available corroborative evidence).

In this respect, the government relies on the IJ's statement, upon which the BIA did not elaborate, that "a different explanation of the documents would come or *different documents* would be here if [Niang] were telling the whole truth." (emphasis added). The governing regulations provide our starting point: "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(b). But this Court has stated that, in the right circumstances, the agency may deny relief to a petitioner on the ground that she has failed to provide sufficient corroboration for her otherwise credible testimony. *Diallo v. INS*, 232 F.3d 279, 285-86 (2d Cir. 2000). Recognizing the dangers of requiring too much from applicants, we have required that the agency provide a specific, reasoned basis for relying on the absence of corroborative evidence. *Id.* at 290; *Qiu* v. *Ashcroft*, 329 F.3d 140, 153 (2d Cir. 2003), *overruled on other grounds, Shi Liang Lin,* 494 F.3d at 305. In this case, the IJ did not identify the "different documents" he thought "would be here" if Niang were telling the truth, and hence ran afoul of our requirement that the agency "must (a) identify the particular pieces of missing, relevant documentation, and (b) show that the documentation at issue was reasonably available to the petitioner." *Qiu*, 329 F.3d at 153.

Particularly in light of Niang's submission of documentary evidence detailing persecution

in Mauritania, and his apparently credible testimony that he was a victim of that persecution, the IJ's throwaway reference to unspecified "different documents" cannot provide an adequate basis for denying petitioner's claims. *See Diallo*, 232 F.3d at 289 (remanding the claims of a Mauritanian applicant because "the BIA did not explain why it was reasonable to expect provision of such materials under its own standards").

**II. The BIA's Changed Country Conditions Determination**

Because we vacate the agency's finding that Niang was not persecuted before he came to this country, we consider an alternative possible ground for upholding its decision to deny his application for withholding of removal under 8 U.S.C. 1231(b)(3). To qualify for withholding, an applicant must show that her "life or freedom would be threatened" in the country to which the government seeks to remove her because of her "race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). On its face, Niang's story would appear to qualify as *past* persecution on account of his race, and hence to give rise to the presumption of a future threat provided for by the regulations.[4] *See* 8 C.F.R. 208.16(b)(1). That presumption can, however, be rebutted by a showing by the government that there has been a "fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds . . . ." *Id.* The government bears the burden of proving such a change by a preponderance of the evidence. *See, e.g., Makadji v. Gonzales*, 470 F.3d 450, 458 (2d Cir. 2006) (vacating the denial of withholding to a Mauritanian applicant who had established past persecution

---

[4] Indeed, the IJ himself accepted that "[t]he kind of persecution [Niang] suffer[ed], according to his testimony, is very strong . . . ."

because the IJ neglected to place this burden on the government).  In this case, the IJ declined to rule that circumstances had changed fundamentally, noting that Mauritania was "still a country that has a very bad human rights record," ruled by a "military dictator."  Departing in this respect from the IJ's determination, the BIA seemed to say that even if Niang's account were true, he should be denied relief because "the record indicates that the current situation in Mauritania has improved dramatically, lessening the likelihood of persecution."

We hold that the BIA provided insufficient reasoning to support its finding of changed country conditions. *See Poradisova v. Gonzales,* 420 F.3d 70, 77 (2d Cir. 2005) ("Despite our generally deferential review of IJ and BIA opinions, we require a certain minimum level of analysis . . . and indeed must require such if judicial review is to be meaningful.")  The agency's rejection of Niang's withholding and CAT claims, therefore, cannot be upheld on this alternate ground.[5]

The BIA's one-line statement that conditions in Mauritania have "improved dramatically" does not suffice as a holding that a fundamental change of circumstances occurred. True, our Court has held that "where . . . changed circumstances *evidently prevail* in a country that is the subject of an appreciable proportion of asylum claims … an immigration judge need not enter specific findings premised on record evidence when making a finding of changed country conditions under the INA." *Hoxhallari v. Gonzales*, 468 F.3d 179, 187 (2d Cir. 2006) (per curiam) (emphasis added).  But we have since said that *Hoxhallari* stands for the "uncontroversial propositions that [i] this Court is not

_____

[5] Neither the IJ nor the BIA addressed Niang's claim under the CAT separately from his claim for withholding.  And though petitioner has clearly not abandoned that claim, neither party has directed specific attention to it in its submissions to this Court. In these circumstances, we remand the CAT claim along with the withholding claim. *See, e.g., Biao Yang v. Gonzales*, 496 F.3d 268, 272 (2d Cir. 2007) ("[I]t is for the agency to make eligibility determinations in the first instance.  Because . . . we remand this case to the agency, the agency should also address [petitioner's] eligibility for CAT relief on remand." (citation omitted)).

ignorant of indisputable historical events (such as the partition of India, the break-up of the Ottoman Empire, or the fall of Communist regimes in the Balkans), and [ii] we will not assume that the agency suffers from such ignorance." *Xiao Xing Ni v. Gonzales*, 494 F.3d 260, 272 (2d Cir. 2007).

Clearly, no "indisputable historical event" supports the BIA's decision, where the IJ, relying on the very same record evidence, reached the opposite conclusion, and explained in detail his reasons for doing so. Since *Hoxhallari* does not apply, the normal requirements for a valid factual determination remain in force. The agency must provide a reasoned basis for its decision, *Beskovic v. Gonzales*, 467 F.3d 223, 227 (2d Cir. 2006), and must premise that decision on substantial evidence in the record, *Tambadou v. Gonzales*, 446 F.3d 298, 303-04 (2d Cir. 2006). Neither of these requirements is satisfied by a bald assertion that conditions in Mauritania have "improved dramatically."

## CONCLUSION

We have identified flaws that go to the heart of the agency's decision to deny Niang's application. We cannot predict with confidence that, in the absence of these errors, the agency would reach the same conclusion, and, as a result, remand is not futile. *See Xiao Ji Chen*, 471 F.3d at 335; *Cao He Lin*, 428 F.3d at 395. Accordingly, we **GRANT** the petition for review, **VACATE** the decision of the BIA to the extent that it denies Niang's claims for withholding of removal and CAT relief, and **REMAND** the case for further proceedings consistent with this opinion. Petitioner's motion for a stay of removal pending the outcome of this appeal is **DISMISSED** as moot.