**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 09a0110n.06
Filed: February 10, 2009
No. 08-3081

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHEIKH SEYDI MOHAMED KOITA,
    *Petitioner, Appellant*

On Appeal from the Board of Immigration Appeals

v.

MICHAEL B. MUKASEY,
    *Respondent, Appellee*

_____/

**BEFORE: KENNEDY, MARTIN, COLE, Circuit Judges**

**KENNEDY, Circuit Judge.** Petitioner Cheikh Seydi Mohamed Koita, a native and citizen of Mauritania, seeks review of a final removal order. Because we find that substantial evidence supports the determination of the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) that changed country conditions in Mauritania preclude petitioner's claims for asylum, withholding of removal, and the Convention Against Torture protection, we DENY his petition for review.

**BACKGROUND**

Petitioner entered the United States on May 2, 2004, on a nonimmigrant visa. On September 29, 2004, petitioner filed an affirmative application for asylum, withholding of removal, and the Convention Against Torture (CAT) relief, alleging that he had suffered past persecution in Mauritania on account of his race, political opinion, and membership in two political organizations and that he feared being persecuted if forced to return. On November 8, 2004, Petitioner was served with a Notice to Appear in removal proceedings, alleging that because he had failed to comply with

the conditions of the student status under which he was admitted, he was removable pursuant to section 237(a)(1)(C)(i) of the Immigration and Nationality Act (INA).

At his merits hearing, petitioner testified to his membership in two political organizations and described four distinct incidents which occurred as a result of his involvement in these groups. In 1997, he became a member of Action for Change (AC), a political party that defended the rights of black students in Mauritania. JA 54-56. Several news articles submitted by petitioner confirmed the existence of this organization, and his valid membership card corroborated his testimony. *See* JA 138-39, 203. The Mauritanian government banned the AC in January 2002. JA 203. As a result, petitioner joined the Rally of Forces Democratic (RFD) political party.

Petitioner's testimony detailed four incidents relevant to his claim of persecution. First, in February 1999, police came to his home at night and took him to the police station, detaining him there for a week. Police took this action after petitioner had participated in an AC rally at his high school. During the detention they stripped him of his clothing, beat him on the head and face with their batons, and kicked and cursed him. After they released him, the police directed him to refrain from further political activities.

The second incident occurred in January 2002, when he participated in an AC meeting at which he and others met to protest the government's banning the AC party. Police arrived and took petitioner and five others to the police station, where he was again detained, this time for three days. After three days, police transferred him to a jail where he was imprisoned for three weeks. While there, the prison guards denied him food, beat him, and poured water on him to prevent him from sleeping.

The third incident to which petitioner testified occurred on July 10, 2004, after petitioner

2

attended a neighborhood RFD meeting at a local soccer field. Police officers and military personnel arrived and again took petitioner away. They transported him to Geraida, a military camp twenty kilometers away. During the five days he was detained there, he was beaten and suffered a broken wrist as a result. Upon his release, officers told him that he was required to report to the police station every three days. He did so twice, and then stopped.

The final relevant incident occurred on November 7, 2003, while petitioner was waiting in line to vote in Mauritania's national election. Noticing that the police officer on duty was allowing whites to cut to the front of the voting line, petitioner confronted the election officials about the officer's fraudulent behavior. The police officer slapped him in the face, grabbed him by the neck, and tore up his voting card. He was again taken to the police station, where he was slapped and hit on the face and head. He was released only upon signing an Arabic document which he did not understand. Four days later, he heard that police had been arresting people and fled to his uncle's home in Nouakchott. His uncle arranged for him to leave Mauritania, and after obtaining his student visa, petitioner departed by crossing into Senegal and flying from there to the United States on April 29, 2004.

At his merits hearing, petitioner was questioned about the current political climate in Mauritania. He testified that although he was aware that a new president was in power as a result of a 2005 coup, "[i]t's still the same regime that continues" because the current president "was the one who was orchestrating or leading the torture during the presidency of the [former] president." He testified that the AC party had sought to accomplish their goals of equality for black Moors through "changing the president" and "elections." He further acknowledged that members of the current transitional government would be ineligible to run in the 2007 elections and that he was

3

aware of the general amnesty that the transitional government had recently issued, releasing all political prisoners. In rebuttal, he pointed to the fact that "it's not only the problem of political problems but also there's a race problem there." He stated that most of the prisoners who had been released were white Moors. When asked what political conditions would have to exist in order for him to be able to return safely to Mauritania, he responded "[t]he only political situation [in which] I would be safe [would be] if there is equality between white Moors and black people because I'm wanted now."

In support of its arguments, the government submitted the State Department's 2005 Country Report on Human Rights Practices in Mauritania ("Country Report"). The Country Report states that Mauritania's "human rights record remains poor" and indicated that racial discrimination against black Moors persisted. It confirmed the occurrence of the 2005 bloodless coup to which petitioner referred in his testimony, and stated that a transitional government was in place. Additionally, it stated that as of 2005, there were no reports of political prisoners. It also noted that there had been a general amnesty for all political prisoners "convicted of coup plotting and related crimes" in September 2005 and that at the end of 2005 the State Department was unaware of any political prisoners being held in Mauritania.

On May 25, 2006, the IJ denied petitioner's applications for asylum, withholding of removal, and the CAT protection, finding that petitioner, while credible, failed to demonstrate past persecution or a well-founded fear of future persecution. The IJ reasoned that under *Mikhailevitch v. INA*, 146 F.3d 384, 391 (6th Cir. 1998), petitioner did not establish past persecution because "brief detentions by an authoritarian regime do not in and of themselves constitute past persecution." In so holding, the IJ acknowledged that because respondent had suffered physical injury as a result of his last

4

detention, this case was a "close call."  In the alternative, the IJ found that petitioner's fear of being persecuted if forced to return to Mauritania was not well-founded because the government, in submitting the 2005 Country Report, had met its burden of establishing that country conditions had changed in Mauritania.  While the IJ acknowledged that "rampant discrimination" still persisted in Mauritania against "Afro-Mauritanians such as respondent," the IJ found significant that "there are no political prisoners in Mauritania; that the EU and the transitional government have been working towards the transitional government agreeing to and indeed the transitional government has stated that they will agree to protection of the rights of all Mauritanians; the firm scheduling of elections in 2007; and the commitment by the current regime, the transitional government, that its members will not stand for election." As to petitioner's claims of persecution on account of race or particular social group, the IJ held that "respondent may have been the victim of discrimination in Mauritania on the basis of his race or ethnicity and he may face further discrimination but he will not face further persecution...viewed objectively."

Petitioner appealed to the Board of Immigration Appeals (BIA) on January 22, 2006.  The BIA affirmed the IJ's decision, finding that even if petitioner's experiences in Mauritania amounted to past persecution, the government had met its burden of proving that, because conditions in Mauritania had changed, petitioner's fear of future persecution was not well-founded.  In dismissing the appeal, the BIA took administrative notice of the fact that "parliamentary elections were held in Mauritania in late 2006 and early 2007, and a historic, free presidential election in March 2007 resulted in the installation of Sidi Ould Cheikh Abdellahi as president in April 2007."   Petitioner timely filed a petition for review in our circuit.

**ANALYSIS**

5

Whether or not petitioner in fact experienced past persecution in his home country of Mauritania, substantial evidence supports the finding of the BIA that conditions in that country have changed such that petitioner's fear of returning to Mauritania would not be well-founded. Because the government met its burden of proving that country conditions in Mauritania had fundamentally changed such that petitioner's fear of persecution was not well-founded, he does not qualify for asylum, withholding of removal, or the CAT protection.

## I. Standard of Review and Applicable Law

Where the BIA reviews the IJ's decision *de novo* and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination. *Morgan v. Keisler*, 507 F.3d 1053, 1057 (6th Cir. 2007). To the extent the BIA adopted the IJ's reasoning, however, this court also reviews the IJ's decision. *See Patel v. Gonzales*, 470 F.3d 216, 218 (6th Cir. 2006). In the present matter, therefore, where the BIA issued a separate decision adopting the IJ's decision as to changed country conditions with supplementary findings, we review both decisions. *Id.* In this case, the BIA did not address the IJ's alternative reason for denying petitioner relief (i.e. that the past incidents petitioner described did not constitute "persecution"). Therefore, if it is necessary to reach that issue, we would be obligated to remand the case. *Yong Zhang Zhu v. Mukasey,* No. 07-3869, 2008 WL 4791310 at *3 (6th Cir. Nov. 4, 2008) *(*citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)).

In determining whether an applicant has failed to establish eligibility for asylum, we assess whether the administrative determination below is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Klawitter v. INS*, 970 F.2d 149, 151-2 (6th Cir. 1992). The Court will reverse only if the applicant can prove that the evidence compels a

contrary conclusion. *Almuhtaseb v. Gonzales*, 453. F.3d 743, 749 (6th Cir. 2006). Arguments not raised in a petitioner's brief are waived on review. *Shkabari v. Gonzales*, 427 F.3d 324, 327 n. 1 (6th Cir. 2005).

Under 8 U.S.C. § 1158(a), the Attorney General has the discretion to grant asylum to "refugees." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987). The INA defines a "refugee" as a person unable to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The determination of whether an individual is eligible for asylum involves two steps. First, the applicant must prove she is statutorily eligible by establishing a "well-founded fear of persecution." An applicant can demonstrate a well-founded fear of persecution by both subjective and objective evidence. *Cardozo-Fonseca*, 480 U.S. at 430-31. If the applicant establishes that he suffered past persecution in his home country, he is presumed to have a well-founded fear of persecution. 8 C.F.R. § 1208.13(b)(1). The government may rebut this presumption by proving by a preponderance of the evidence that conditions in the applicant's home country have changed fundamentally such that the petitioner's fear of future persecution is not well-founded. 8 C.F.R. § 1208.13(b)(1)(i)(A). If the government meets its burden, the petitioner must then demonstrate that his fear is well-founded despite the changed conditions. *Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005). Second, the applicant must show that the Immigration Judge should exercise his discretion to grant asylum. *See Klawitter,* 970 F.2d at 151 (quoting *Rodriquez-Rivera v. INS*, 848 F.2d 998, 1001 (9th Cir.1988)).

## II. Asylum Claim

Substantial evidence supports the IJ's and BIA's conclusion that even if petitioner

experienced past persecution in Mauritania, he does not have a well-founded fear of future persecution because the government successfully demonstrated sufficient evidence of a fundamental change in country conditions in Mauritania. Because the government met this burden, we need not address the question of whether or not petitioner suffered past persecution in his home country. Petitioner argues that the Country Report offered by the government as evidence of changed country conditions actually supports his claim. He notes that the Country Report states the transitional government's human rights record remained "poor" and that black Moors continued to be subject to pervasive discrimination. He argues that the recent changes in Mauritania's leadership have not eradicated the conditions that led to his fear of persecution. As a result, he asserts that the government failed to meet its burden of proving changed country conditions.

According to the Country Report, in August 2005 a bloodless coup deposed the former president and replaced him with Colonel Ely Ould Mohamed Vall. As the IJ and BIA noted, a transitional government was in power in Mauritania at the time of the merits hearing. The Country Report reflects that "[t]he transitional government, following 'National Consultations' with over 500 political parties, NGOs, and public figures, released a time line for a transition to democracy calling for presidential and parliamentary elections no later than March 2007," and that this time line had been agreed to by the EU. In addition, it states that the transitional government received assurances from the United Nations that they would provide election preparation assistance, and that members of the transitional government had agreed to not stand for the 2007 election. Most relevant to petitioner's claim is the Country Report's statements that the transitional government had released, through a general amnesty, those convicted of "coup plotting and related crimes" and that there were "no reports of political prisoners."

8

Additionally, the BIA took administrative notice of the fact that "parliamentary elections were held in Mauritania in late 2006, and early 2007, and a historic, free presidential election [occurred] in March 2007." Petitioner argues that the BIA erred in taking administrative notice of this fact. The regulations, however, clearly recognize the power of the BIA to take administrative notice of "commonly known facts such as current events" in Mauritania. 8 C.F.R. § 1003.1(d)(3)(iv). Furthermore, "[s]everal courts of appeals, including ours, have upheld the practice of an IJ or the BIA taking administrative notice of commonly known facts." *Vasha*, 410 F.3d at 874 n. 5. Along with several other circuits, we have held that regime changes and elections in foreign nations constitute "commonly known facts" within the meaning of 8 C.F.R. § 1003.1(d)(3)(iv). *See, e.g., Hadad v. Ashcroft*, 127 F. App'x. 800, 802 (6th Cir. 2005) (noting that in several unpublished opinions, this court "has approved the practice of administrative notice of 'significant events' and 'commonly acknowledged facts'" and upholding the BIA's notice of regime change in Iraq); *Llana-Castellon v. INS*, 16 F.3d 1093, 1097 (10th Cir.1994) (upholding the BIA's notice of elections and a new government in Nicaragua); *McLeod v. INS*, 802 F.2d 89, 94 (3d Cir.1986) (upholding the IJ's notice of the change in the government of Grenada). It is a commonly known fact that democratic elections took place in Mauritania in 2006 and 2007. The BIA did not err in taking administrative notice of the fact that the recent elections had occurred.

Based on the 2007 election, of which the BIA took administrative notice, and the 2005 Country Report, this case in distinguishable from *Niang v. Mukasey*, in which the Second Circuit held that the BIA failed to provide sufficient reasoning to support a finding that country conditions had fundamentally changed in Mauritania. *See* 511 F.3d 138 (2nd Cir. 2007). Although that case was decided in 2007, the petitioner's claim was heard and decided before the IJ in 2003.

9

Additionally, the BIA issued its decision in that case in 2004. Because of the difference in dates, the record before the court in that case was substantially different than the record before us today. At the time *Niang* was decided, the 2005 Country Report was not in existence, and the 2007 general election had not been held or even promised. Here, by the time the petitioner's claim was appealed to the BIA, a general election had occurred such that the judge was able to take administrative notice of that fact. Because of the significant changes that Mauritania has undergone in recent years, the record in this case is sufficiently different to distinguish our case from the claim of the petitioner in *Niang*. *See* 511 F.3d 138.

In *Sy v. Mukasey*, we held that a former AC and UFD member who had been imprisoned and physically injured for his political opposition did not have a well-founded fear of persecution because of changed country conditions in Mauritania. 278 F. App'x. 473, 474 (6th Cir. 2008). In response to the petitioner's argument in that case that the "new regime brought only cosmetic changes," we stated that "substantial evidence supports more than a sham change of power." *Id*. at 476. The present case presents an identical situation. While portions of the 2005 Country Report remain troubling, including reports of continued human rights abuses by the transitional government as well as that regime's suppression of political parties, we cannot supplant the BIA's factual findings by weighing certain portions of the Country Report more heavily than others. *See Arkansas v. Oklahoma*, 503 U.S. 112, 113 (1992)("The court should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence."). We find that because substantial evidence supports the BIA's determination that conditions in Mauritania have fundamentally changed, petitioner's fear of persecution is not well-founded. The IJ and BIA therefore properly denied his claim for asylum.

## III. Withholding of Removal Claim

Substantial evidence supported the denial of petitioner's claims for statutory withholding of removal and the CAT relief. Withholding of removal is mandatory if an "alien's life or freedom would be threatened [in the country of deportation] on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1). This is a more stringent standard than that which is required to establish eligibility for asylum. *See Berri v. Gonzales,* 468 F.3d 390, 396 (6th Cir. 2006). Where an applicant fails to satisfy the statutory requirements for asylum, "the record necessarily supports the finding that [the applicant does] not meet the more stringent standard of a clear probability of persecution required for withholding of [removal]." *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir.2005). In this case, where petitioner failed to meet the less stringent standard for asylum, his claim for withholding of removal is without merit.

## IV. Convention Against Torture Claim

The petitioner additionally requested relief under the provisions of the United Nations Convention Against Torture. To obtain relief under the CAT, the applicant bears the burden of establishing "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). This burden is significantly greater than the burden required to demonstrate eligibility for asylum. Whereas asylum may be granted by the attorney general upon a showing of a "well-founded fear of persecution," withholding of removal under the CAT requires a showing that it is more likely than not that petitioner would not only be persecuted upon his return to Mauritania, but that he would be tortured. Because petitioner cannot demonstrate entitlement to a grant of asylum, he also cannot meet the more stringent requirements of the CAT.

*See, e.g., Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005). Substantial evidence thus supports the

IJ's and BIA's denial of relief under the CAT.

## CONCLUSION

For the foregoing reasons, we DENY the petition for review.